IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **CARLENE JONES** | * | |
| **4436 Flintstone Road** | | |
| **Alexandria, Virginia 22306** | * | |
| | | |
| **and** | * | |
| | | |
| **TALEASE GAITHER** | * | |
| **11502 Aquarius Court** | | |
| **Fort Washington, Maryland 21744** | * | |
| | | **Case No.: 1:24-cv-652** |
| **and** | * | |
| | | |
| **SHARONDA FINCH** | * | |
| **600 Cowardin Avenue, Apartment 115** | | |
| **Richmond, Virginia 23224** | * | |
| | | |
| **Plaintiffs,** | * | |
| | | |
| **v.** | * | |
| | | |
| **BALTIMORE POLICE DEPARTMENT** | * | **COMPLAINT AND** |
| **601 E. Fayette Street** | | |
| **Baltimore, Maryland 21202** | * | **JURY DEMAND** |
| **SERVE:      Richard Worley, Commissioner** | | |
| | * | |
| **and** | | |
| | * | |
| **CLAYTON LEAK** | | |
| **601 E. Fayette Street** | * | |
| **Baltimore, Maryland 21202** | | |
| | * | |
| **and** | | |
| | * | |
| **MATTHEW TOBJY** | | |
| **601 E. Fayette Street** | * | |
| **Baltimore, Maryland 21202** | | |
| | * | |
| **and** | | |
| | * | |
| **JAMES CRAIG** | | |
| **601 E. Fayette Street** | * | |

Baltimore, Maryland 21202

          *

and

          *

**JOSHUA JACKSON**
**601 E. Fayette Street**

          *

**Baltimore, Maryland 21202**

          *

and

          *

**JARED DOLLARD**
**601 E. Fayette Street**

          *

**Baltimore, Maryland 21202**

          *

and

          *

**ANDREW GIBBS**
**601 E. Fayette Street**

          *

**Baltimore, Maryland 21202**

          *

and

          *

**COMMISSIONER MICHAEL HARRISON**
**601 E. Fayette Street**

          *

**Baltimore, Maryland 21202**

          *

and

          *

**DEANDRE JOHNSON**
**2802 Woodland Avenue**

          *

**Baltimore, Maryland 21215**

          *

  **Defendants.**

* * * * * * * * * * * * *

## **COMPLAINT AND DEMAND FOR JURY TRIAL**

  Plaintiffs, Carlene Jones, Talease Gaither, and Sharonda Finch, by and through their attorney, Hannah M. Ernstberger and the firm of Saller, Lord, Ernstberger & Insley, hereby file this Complaint against the Defendants, Baltimore Police Department, Clayton Leak, Matthew Tobjy, James Craig, Joshua Jackson, Jared Dollard, Andrew Gibbs, Commissioner Michael Harrison, and Deandre Johnson and in support thereof, states as follows:

2

## INTRODUCTION

1.      On March 9, 2021, Baltimore Police Department officers allegedly witnessed Defendant Deandre Johnson reverse his vehicle down a one-way street. The officers attempted to conduct a traffic stop of Defendant Johnson in the 4800 block of Laurel Avenue, in the Cylburn neighborhood of Baltimore City, Maryland.

2.      Defendant Johnson failed to stop, and the officers pursued.

3.      Due to the speed and erratic driving of Defendant Johnson's vehicle, the officers eventually backed off and requested the Baltimore Police Department's aviation unit to maintain surveillance of the vehicle.

4.      The aviation unit followed Defendant Johnson's vehicle for about six minutes. With solely the aviation unit in pursuit, Defendant Johnson traveled with traffic and obeyed multiple red lights. However, additional Baltimore Police Department officers positioned their vehicles behind Defendant Johnson's vehicle at the intersection of North Gay Street and Lexington Street, near Baltimore's City Hall.

5.      Despite Defendant Johnson previously fleeing and proceeding through traffic in an unsafe manner when followed by the initial police vehicle, Baltimore Police Department officers again attempted to stop Defendant Johnson in a densely populated downtown area during rush hour traffic.

6.      Again, Defendant Johnson failed to stop.

7.      Defendant Johnson took off at a high rate of speed and ran at least one red light as he proceeded north on North Gay Street until he ultimately approached another red light at the intersection of North Gay Street and Orleans Street.

8.     A short distance away, Plaintiff Carlene Jones was driving her 2013 BMW westbound on Orleans Street in Baltimore City, Maryland. Plaintiff Talease Gaither was a front seat passenger of Plaintiff Jones' vehicle and Plaintiff Sharonda Finch was a backseat passenger. The Plaintiffs were coming from Johns Hopkins Hospital.

9.     As Plaintiffs' vehicle continued westbound on Orleans Street through its intersection with North Gay Street, Defendant Johnson entered the intersection from North Gay Street, contrary to a redlight.

10.    Defendant Johnson caused his vehicle to collide with a black vehicle proceeding eastbound on Orleans Street before then causing both his vehicle and the black vehicle to strike the Plaintiffs' vehicle as it proceeded through the intersection.

11.    Plaintiffs' vehicle spun 90-degrees, before being struck by yet another vehicle and finally coming to a stop.

12.    As Plaintiffs sat helpless, entrapped in their totaled vehicle, Defendant Johnson took off on foot, followed by the Baltimore Police Department officers.

13.    Three years later, Plaintiffs continue to suffer from the multitude of injuries sustained during this traumatic crash.

## JURISDICTION AND VENUE

14.    This is an action for monetary relief for violation of the Fourth Amendment of the United States Constitution pursuant to 42 U.S.C. § 1983.

15.    This Court has jurisdiction of Plaintiffs' federal claims pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction of Plaintiff's state law claims under 28 U.S.C. § 1367.

16.     This Court is the appropriate venue pursuant to 28 U.S.C. § 1391(b) because the events and omissions giving rise to the claims occurred in this judicial district and, upon information and belief, all Defendants reside in this judicial district.

17.     On or about January 27, 2022, Plaintiffs provided notice of their claim against Baltimore Police Department to the Baltimore City Solicitor via certified mail, pursuant to the notice requirements of the Local Government Tort Claim Act. *See* LGTCA Notice, attached hereto as **Exhibit A.**

<u>**PARTIES**</u>

18.     Plaintiff Carlene Jones ("Jones") is an individual and resident of the Commonwealth of Virginia and, at all times relevant to this action, was a resident of the Commonwealth of Virginia.

19.     Plaintiff Talease Gaither ("Gaither") is an individual and resident of the State of Maryland and, at all times relevant to this action, was a resident of the State of Maryland.

20.     Plaintiff Sharonda Finch ("Finch") is an individual and resident of the Commonwealth of Virginia and, at all times relevant to this action, was a resident of the Commonwealth of Virginia.

21.     Plaintiffs referenced in paragraphs 18 through 20 shall be referred to, collectively, as "Plaintiffs."

22.     The Baltimore Police Department ("BPD") is an agency of the State of Maryland. The BPD is responsible for conducting criminal investigations and apprehensions in a reasonable manner to protect the life and well-being of Maryland residents. Through its policy-making officers, including Defendant Commissioner Michael Harrison, BPD creates, implements, and ratifies policies, practices, habits, customs, and procedures, and is responsible for the training and

supervision of officers regarding apprehension of suspected criminals, particularly those during high-speed vehicle pursuits. As an agency of the State of Maryland, the BPD acted under color of state law at all times relevant.

23.     Clayton Leak ("Leak") is an employee of the BPD and, upon information and belief, a resident of the State of Maryland. At all times relevant, Leak participated in the emergency pursuit of Defendant Johnson on March 9, 2021, and allegedly acted pursuant to an established policy and training of the BPD regarding vehicle pursuits. Leak is sued in his individual capacity.

24.     Matthew Tobjy ("Tobjy") is an employee of the BPD and, upon information and belief, a resident of the State of Maryland. At all times relevant, Tobjy participated in the emergency pursuit of Defendant Johnson on March 9, 2021, and allegedly acted pursuant to an established policy and training of the BPD regarding vehicle pursuits. Tobjy is sued in his individual capacity.

25.     James Craig ("Craig") is an employee of the BPD and, upon information and belief, a resident of the State of Maryland. At all times relevant, Craig participated in the emergency pursuit of Defendant Johnson on March 9, 2021, and allegedly acted pursuant to an established policy and training of the BPD regarding vehicle pursuits. Craig is sued in his individual capacity.

26.     Joshua Jackson ("Jackson") is an employee of the BPD and, upon information and belief, a resident of the State of Maryland. At all times relevant, Jackson participated in the emergency pursuit of Defendant Johnson on March 9, 2021, and allegedly acted pursuant to an established policy and training of the BPD regarding vehicle pursuits. Jackson is sued in his individual capacity.

27.     Jared Dollard ("Dollard") is an employee of the BPD and, upon information and belief, a resident of the State of Maryland. At all times relevant, Dollard participated in the

emergency pursuit of Defendant Johnson on March 9, 2021, and allegedly acted pursuant to an established policy and training of the BPD regarding vehicle pursuits. Dollard is sued in his individual capacity.

28.     Andrew Gibbs ("Gibbs") is an employee of the BPD and, upon information and belief, a resident of the State of Maryland. At all times relevant, Gibbs participated in the emergency pursuit of Defendant Johnson on March 9, 2021, and allegedly acted pursuant to an established policy and training of the BPD regarding vehicle pursuits. Gibbs is sued in his individual capacity.

29.     Defendants referenced in paragraphs 23 through 28 shall be referred to as the "Officer Defendants."

30.     Commissioner Michael Harrison ("Harrison") was, at all times relevant, an employee and officer of the BPD and, on information and belief, a resident of the State of Maryland. Harrison was the Commissioner of Baltimore City Police Department from March 12, 2019, until June 8, 2023. Harrison was directly or jointly responsible for creating, implementing, maintaining, and training of officers in BPD's policies and practices regarding criminal apprehension through vehicle pursuits; Harrison is sued in his individual capacity.

31.     Defendants referenced in paragraphs 22 through 28 and 30 shall be referred to as the "BPD Defendants."

32.     Deandre Johnson ("Johnson") is a resident of the State of Maryland and was the target of the police pursuit described herein.

33.     All Defendants are jointly and severally liable for damages and injuries to the Plaintiffs.

## FACTS COMMON TO ALL COUNTS

### I.     BPD'S VEHICLE PURSUIT POLICY

34.     The Baltimore City Police Department's implementation of its emergency vehicular pursuit policy (1) caused the serious bodily injury to Plaintiffs and (2) is part of a persistent pattern of unconstitutional policing practices.

35.     BPD Policy 1503, effective September 13, 2017, was the controlling vehicular pursuit policy during the incident giving rise to this case. *See* "Policy 1503: Emergency Vehicle Operation and Pursuit Policy," attached hereto as **Exhibit B.**

36.     Policy 1503 was first created in the wake of the Department of Justice Civil Rights Division's investigative report (hereinafter, the "Report") released August 10, 2016.[1] This Report studied BPD policing incidents between 2010-2015 and came to general conclusions that the BPD was failing because of "deficient policies, training, oversight, accountability, and policing strategies that do not engage effectively with the community the Department serves."[2]

37.     The Report evaluated pursuits[3] during the review period alongside the lack of an explicit excessive force policy and noted that BPD's pursuits and use of force policies mutually reinforced one another in a way that endangered the citizens of Baltimore.[4]

38.     The Report implored BPD to provide:

> …policy guidance and training on when and how to safely engage in [] pursuits, given the frequency with which officers conduct them in Baltimore, and the risks involved for both officers and the public. It is critical that BPD provide officers with policy guidance on how to assess whether circumstances warrant engaging in a foot pursuit, and sufficient

---

[1] U.S. Department of Justice, Civil Rights Division, *Investigation of the Baltimore City Police Department,* (August 10, 20176), available at https://www.justice.gov/opa/file/883366/dl?inline.
[2] *Id.* at 163.
[3] Though the Report specifies foot pursuits, the Report also notes, "BPD's aggressive approach to foot pursuits extends to flight in vehicles." *Id.* at 9.
[4] *Id.* at 92-96.

training on how to conduct these pursuits safely, without needlessly endangering themselves, suspects, and the public.[5]

39.     As a result, BPD issued Policy 1503 on September 13, 2017, which mirrored some of the language referenced in the Report.

40.     Policy 1503 was amended on November 24, 2019, "pursuant to the policies of a Consent Decree[6] entered by this Court on April 7, 2017."[7] *See* Exhibit B. This was the version of Policy 1503 in effect at the time of the facts giving rise to this case.

41.     Policy 1503 outlines fourteen "Core Principles," highlighting the importance of the "sanctity of human life" and the actions that shall be taken to preserve the "value and worth of all persons."

42.     Policy 1503 also outlines policies on "Vehicle Pursuit Authorization," "Vehicle Pursuit Prohibitions," "Vehicle Pursuit Considerations," and the responsibilities of the various units involved. *See Id.* These sections outline the various factors to be taken into consideration prior to and while engaging in a vehicle pursuit.

43.     Policy 1503 also includes a "Duty to Intervene," noting that officers "shall intervene to prevent abusive conduct or the use of excessive force by another member." *See Id.*

44.     BPD has spent years trying to justify, in courts of law, why their training and implementation of the controlling relative policy and practice of vehicular pursuits at the time of the incident met the threshold of constitutionality, despite it killing or severely injuring innocent bystanders including:

---

[5] *Id.* at 96.

[6] The City of Baltimore entered into a Consent Decree with the Department of Justice on April 7, 2017. That Consent Decree required BPD to "implement comprehensive reforms that will ensure … officers conduct all investigatory stops, searches and arrests in a manner that protects people's rights," among other reforms. *See City of Baltimore Consent Decree*, City of Baltimore, https://consentdecree.baltimorecity.gov (last updated 2024).

[7] *Simmons v. Baltimore City Police Department*, No. RDB-21-0969, 2021 WL 3418840 (D. Md. Aug. 5, 2021).

a. Terril Corbett: On December 15, 2017, Terril Corbett was driving in a vehicle on his way to Home Depot with a friend when a suspect being pursued began firing at BPD officers. The officers returned fire, striking Mr. Corbett in the head as he innocently drove by.

b. Darrius Gore, Gary Tyson: On March 21, 2020, Darrius Gore was a 28-year-old Baltimore man who was lawfully driving home with a friend, Gary Tyson, when a suspect being pursued crashed into his vehicle and he spent a month in a coma before ultimately succumbing to his injuries. Gary Tyson was also severely injured.

c. Unknown Civilian: On September 20, 2020, BPD officers attempted to stop a driver for running a red light. The fleeing driver led the officers on a brief pursuit before crashing his vehicle into an innocent driver. The innocent driver was transported by medics to the University of Maryland Hospital.[8]

45.    Darrius Gore, Gary Tyson, Terril Corbett and the unknown civilian were each killed or severely injured after the implementation of Policy 1503.

46.    Although the language of BPD's emergency vehicular pursuit policy has changed over the years, the custom, practice, and culture within BPD regarding initiation and continuation of vehicular pursuits has proliferated a deadly pattern ending the lives of innocent bystanders.

## II.    FORESEEABILITY OF INJURY TO INNOCENT BYSTANDERS

47.    Nationwide, law enforcement vehicular pursuits are so deadly to innocent civilians that federal government agencies have investigated and offered guidance on their deadly practices in recent years.

48.    The Department of Justice recently analyzed statistics of such vehicular police pursuits in a 2017 Report[9] and attributed the data as a result of controlling municipal policies.

---

[8] *Sixth Report to the State of Maryland – Deaths Involving a Law Enforcement Officer,* Maryland Governor's Office of Crime Prevention, Youth, and Victim Services, 25 (June 30, 2021), available at https://goccp.maryland.gov/wp-content/uploads/PS-§-3-507e_-GOCPYVS-2019-Deaths-Involving-a-Law-Enforcement-Officer-MSAR-12665.pdf.
[9] Brian A. Reaves, *Police Vehicle Pursuits 2012-2013*, U.S. Department of Justice, 1 (2017).

49.     Between 1996 and 2015, more than 6,000 fatal pursuit-related crashes occurred, resulting in an average of 355 persons – nearly one a day – killed annually.[10] Of this figure, 277 were non-occupants or innocent civilians not involved in the pursuit.[11]

50.     The above figure is not even wholly indicative of how deadly such pursuits are; Geoffrey Alpert, a professor of criminology at the University of South Carolina who has studied police pursuits since the 1980s, says the actual figure is likely "three or four times higher."[12]

51.     In 2004, researchers analyzed 7,430 deaths resulting from vehicular pursuits and reported that innocent bystanders make up nearly one-third of all deaths resulting from such high-speed police pursuits.[13]

52.     The above statistic does not consider the number of innocent bystanders who have suffered bodily injury from these pursuits. Between 2009 to 2013, two serious injuries occurred per 100 vehicle pursuits, and 21% of the time the injury was sustained by an innocent person.[14]

53.     A more recent study conducted by the Los Angeles Police Department, who maintains a similar police pursuit policy to that of BPD, revealed that between 2018 and 2023, the LAPD's vehicle pursuits resulted in a crash causing death or serious injury 25% of the time.[15] Of those deaths and serious injuries, 49% percent were suffered by innocent third parties.[16]

54.     Each version of the BPD's vehicular pursuit policy and its implementation affirms a disturbing trend of death and/or serious bodily injury to innocent Baltimore citizens.

---

[10] *Id.* at 6.

[11] *Id*. at 13.

[12] Thomas Frank, *High-speed police pursuits have killed thousands of innocent bystanders,* USA Today (Jul. 30, 2015, 5:56 P.M.), https://www.usatoday.com/story/news/2015/07/30/police-pursuits-fatal-injuries/30187827/.

[13] Zachary Crockett, *The Case for Banning High-Speed Pursuits*, Priceonomics (Jul. 22, 2015), https://priceonomics.com/the-case-for-banning-high-speed-police-pursuits/.

[14] *Reaves, supra,* at 7.

[15] *Vehicle Pursuit Analysis for the Board of Police Commissioners*, Los Angeles Police Department, 5 (April 29, 2023), available at http://www.lapdpolicecom.lacity.org/042523/BPC_23-082.pdf.

[16] *Id.*

55.     In fact, the BPD recently amended Policy 1503 to include "Vehicle Pursuit Authorization" language, in relevant part, "Supervisors shall ask clarifying questions to determine whether the elements listed above[17] exist." *See* "Policy 1503: Emergency Vehicle Operation and Pursuit Policy, 9 October 2023," attached hereto as **Exhibit C.**

56.     The amended Policy also eliminates a directive noting, "members are authorized but not required to respond in Emergency Response Mode." *Compare* Exhibit B *with* Exhibit C.

57.     Further, statewide, Maryland had 81 total pursuit-related fatalities between the years of 1996 to 2015.[18] Of those, four were innocent bystanders.[19]

58.     However, this data cannot possibly account for all innocent civilian deaths (and deaths in general) resulting from Maryland's use of vehicular police pursuits during that time. In fact, following national pressure to manage unconstitutional police practice resulting in civilian death, all local law enforcement agencies in Maryland are now required by the Governor to provide comprehensive annual reports that identify any deaths that occurred as a result of actions (or omissions) by any police officer.[20]

59.     In connection with those reports, the Office of the Attorney General's Independent Investigations Division investigates such deaths.[21] One of those recent investigations was of a police-involved death in Baltimore City on February 8, 2023, wherein Baltimore Police officers

---

[17] "[1]The vehicle contains a felony suspect and failure to immediately apprehend poses an immediate threat of death or serious bodily injury to the member or others; and [2] Before the pursuit is initiated, there exists probable cause to believe the fleeing suspect committed a felony which resulted, or could have resulted, in death or serious bodily injury."

[18] *Reaves*, at 13.

[19] *Id.*

[20] Md. Stat. Analysis Ctr., Governor's Off. Of Crime Control & Prevention, *Reports to the State of Maryland under HB 954* (2015-2022), https://goccp.maryland.gov/crime-statistics/law-enforcement-reports/deaths-involving-law-enforcement/; *See also Simmons v. Baltimore City Police Department;* No.: 1-21-cv-009690RDB, 12 (D. Md. filed 2020).

[21] *See* Md. Atty. Gen., Independent Investigations Division, https://www.marylandattorneygeneral.gov/Pages/IID/IID_faq.aspx (last visited March 2, 2024).

initiated and continued a vehicular pursuit until it ended in a crash with an innocent civilian's vehicle.[22]

60.     In the report generated, the Office of the Attorney General noted, in relevant part, "a fatal car crash is within the likely realm of consequences of a police pursuit," and "the death of a suspect or bystander is a foreseeable outcome of [a police-involved vehicular] pursuit."[23]

61.     Beginning in 2015, when data was first reported, until 2019, at least thirty Maryland citizens have lost their lives to police pursuits; seven of which were innocent bystanders.[24] Out of these thirty deaths, five of them (so far) were directly attributable to the BPD.[25] Between 2012 and 2021, Baltimore citizens filed seven distinct lawsuits against the BPD, *et. al.*, for fatalities of innocent bystanders resulting from their vehicular pursuit practices:

     a.   *Halloway-Johnson, v. Beall, et al.;* 2012; Case No.: 24-C-11002394, Cir. Ct. for Balt. City.

     b.   *Yolanda Williams, et al. v. Mayor and City Council for Baltimore City*; 2015; Case No.: 24-C-15-0000935, Cir. Ct. for Balt. City.

     c.   *Ntambo Ciwengo, et al. v. Estate of Terrell Young, et al.;* 2017; case No.: 24-C-15005795; Cir. Ct. for Balt. City.

     d.   *Shirley Johnson, et al. v. Umar Burley, et al.;* 2020; Case No.: 24-C-13002083; Cir. Ct. Balt. City & *Shirley Johnson, et al. v. Baltimore Police Department;* 2020; Case No. 24-C-13002083; D. Md; under both cases the facts are the same.

     e.   *Smallwood, et al. v. Off. Joseph Kamberger, et al.*; Case No.: 24-C-17-005327; Cir. Ct. Balt. City.

     f.   *Simmons v. Baltimore City Police Department, et al.*; 2021; Case No.: 1:21-cv-009690RDB; D. Md.

     g.   *Terril Corbett v. Baltimore Police Department, et al.*; 2020; Case No.: 1:20-cv-03431-BAH; D. Md.

62.     With the exception of *Corbett v. Baltimore Police Department, et al.*, the above-listed cases do not reflect cases, such as this present case, where BPD vehicular pursuits resulted in

---

[22] Md. Atty. Gen., Independent Investigations Division, *Report Concerning the Police-Involved Death in Baltimore City on February 8, 2023,* (June 30, 2023), available at
https://www.marylandattorneygeneral.gov/Pages/IID/Reports/020823_IID_Report.pdf.
[23] *Id.* at 21.
[24] *Id.*
[25] *Id.*

the serious bodily injury to an innocent bystander. These cases are, thus, only a small sample of BPD's policy, custom, and practice of vehicular pursuits that have fundamentally, in their collective failure, harmed innocent Baltimore residents.

63.    The language of BPD's Policy 1503 reflects the Department's understanding of the grave risks involved in vehicular pursuits. The Policy states, in relevant part:

    a.  Members shall make every effort to preserve human life in all situations.
    b.  All human beings have equal value and worth and members shall respect and uphold the value and dignity of all persons at all times.
    c.  Members shall use de-escalation techniques and tactics to reduce any threat […].
    d.  The BPD recognizes it is better to allow a suspect to temporarily escape apprehension than to jeopardize anyone's safety in a Vehicle Pursuit.
    e.  Before operating a law enforcement vehicle in Emergency Response Mode, members shall consider the following… pedestrian and vehicular density.
    f.  Factors that shall be considered, both individually and collectively, when deciding to initiate or continue a pursuit, include, but are not limited to…the safety of the public, including: the type of area, such as a school zone; time of day and lighting; weather, road conditions, and density of vehicular and pedestrian traffic; and the speed of the pursuit relative to those factors.
    g.  The highest responsibility of the Primary Unit is the preservation of life and public safety.[26]

64.    While the language of the policy reflects an understanding of the risks police pursuits pose to the general public, BPD's implementation of said policy fails to preserve those same concerns, as is evidenced by the cases highlighted *supra*.

65.    This failure is due to BPD's failure to properly train and supervise its officers, as well as BPD's condonation of the substandard procedures actually implemented.

### III.    MARCH 9, 2021, PURSUIT OF DEANDRE JOHNSON

66.    Paragraphs 67 to 72, *infra*, are based on the statements recorded in a Statement of Probable Cause authored by Defendant Leak on or about March 10, 2021. *See* Statement of Probable Cause, attached hereto as **Exhibit D.**

---

[26] *See* Exhibit B, Policy 1503: Emergency Vehicle Operation at Pursuit Policy.

67.     On March 9, 2021, at around 3:45 p.m., Defendants Craig, Leak, and Tobjy were conducting routine patrol in the 4900 block of Laurel Avenue, in the Cylburn neighborhood of Baltimore City. The officers were in an unmarked police vehicle. Defendant Craig was the driver, Defendant Leak was the front seat passenger, and Defendant Tobjy was a rear seat passenger.

68.     Defendant Leak observed a grey Honda Odyssey, later determined to be driven by Defendant Johnson, reversing westbound in the 2800 block of West Garrison Avenue, a one-way road.[27] The Odyssey had a cracked windshield.

69.     Also in the Odyssey was Defendant Johnson's girlfriend, Destiny Saulsbury.

70.     Defendant Leak activated emergency equipment to conduct a traffic stop of the Odyssey in the 4800 block of Laurel Avenue. The Odyssey failed to stop and began to accelerate "in a clear attempt to elude officers."

71.     Defendant Leak requested Foxtrot, BPD's aviation unit, for air support due to the "erratic driving of the Honda." The officers backed off "do [*sic*] to the speed of the fleeing Honda van."

72.     Foxtrot followed the Odyssey, which entered onto Interstate 83, proceeding southbound. Foxtrot continued to follow the Odyssey, periodically providing updates to BPD dispatch as to the vehicle's location. The Odyssey eventually exited Interstate 83 onto Holliday Street. "Foxtrot did not lose sight of the Honda Odyssey."

73.     Paragraphs 74 to 82, 84 to 89, and 91 to 92, *infra*, are based on the statements recorded in the Statement of Probable Cause authored by Defendant Leak on or about March 10, 2021, along with statements and images captured by various BPD officers' body-worn cameras,

---

[27] West Garrison Avenue is a two-way residential road in the 4900 block, but narrows slightly at the 4800 block and becomes a one-way street with traffic proceeding east to west.

Foxtrot's surveillance videos, a State of Maryland Motor Vehicle Crash Report, and the citywide dispatch recordings of March 9, 2021.

74.     After exiting Interstate 83, Defendant Johnson, in the Odyssey, traveled with traffic behind a third-party vehicle at normal traffic speed. The two vehicles safely proceeded through two green lights before coming to a stop on Holliday Street behind another third-party vehicle, stopped at a red light at the intersection with East Lexington Street. At this time, Defendant Johnson was in the heart of downtown Baltimore City, positioned directly in front of City Hall.

75.     Defendant Johnson sat at the red light, behind traffic, for nearly a full minute while Foxtrot circled overhead and relayed his location in traffic over citywide dispatch.

76.     During this time, Foxtrot inquired as to why the Odyssey was being followed. Defendants Craig, Leak, and Tobjy advised "he was coming from the location in Park Heights where the shooting was in Northwest," which dispatch relayed. This statement is false.[28]

77.     When the light turned green, the two third-party vehicles proceeded to turn left through the intersection. Defendant Johnson began to enter the intersection when Defendant Jackson entered the intersection, from East Lexington Street, despite facing a red light. Defendant Johnson slowed, nearly stopping, before he ensured it was safe to proceed and made a left turn onto East Lexington Street.

78.     Defendant Johnson continued to travel safely at normal traffic speed before coming to a stop, again behind a third-party vehicle stopped at a redlight. Defendant Jackson positioned

---

[28] The Cylburn neighborhood is separate and distinct from the Park Heights neighborhood. Upon information and belief, the shooting referenced occurred around 2:30 p.m. in the 4400 block of Park Heights, a mile from where officers first attempted to stop Defendant Johnson. Further, the shooting was also not referenced in Defendant Leak's Statement of Probable Cause. And the Officers later clarified after the crash that Defendant Johnson was not wanted in relation to that shooting.

his vehicle behind Defendant Johnson's vehicle as they sat at the redlight at the intersection of East Lexington Street and North Gay Street, still in the heart of downtown Baltimore City.

79.     Defendant Johnson sat stopped, pursuant to the redlight, for about 45 seconds before the light changed. During this time, the following events occurred:

     a.  Defendant Jackson announced over dispatch that he was behind the Odyssey.

     b.  Defendants Craig, Leak, and Tobjy instructed Defendant Jackson to attempt to pull over the Odyssey. Another BPD Officer, thought to be Captain Jeffrey Featherstone, clarified over dispatch: "Unit that is behind the vehicle, attempt to make a safe stop. Get him a back-up unit. If he takes off, Fox[trot] has him."

     c.  Defendant Dollard arrived at the location and positioned his vehicle to the right of Defendant Jackson's vehicle. Defendant Gibbs was the front-seat passenger of Defendant Dollard's police vehicle.

80.     When the light turned to green, Defendants Jackson and Dollard activated their lights. Defendant Jackson activated a 'yelp' sound from his vehicle, in an attempt to signal to Defendant Johnson instructions to pull over. Neither Defendant Jackson nor Defendant Dollard activated their full emergency sirens, then or at any point relevant herein.

81.     Defendant Johnson, followed by Defendant Jackson and Defendant Dollard, sped northbound on North Gay Street through a redlight at the intersection with East Saratoga Street, then narrowly missed striking a stopped vehicle before proceeding through the intersection with Fallsway.

82.     As the vehicles continued to accelerate through the 300 block of North Gay Street towards Orleans Street,[29] Defendant Jackson radioed that they were approaching a redlight,[30] and there would "probably be an accident."

83.     At the same time, a short distance away, Plaintiff Carlene Jones was driving her BMW westbound on Orleans Street. She and Plaintiff Talease Gaither just picked up Plaintiff Sharonda Finch from the Johns Hopkins Hospital, located in the 1800 block of Orleans Street.

84.     The trio – a mother, daughter, and niece – were proceeding with traffic in the far-left lane of westbound Orleans Street when they approached the intersection with North Gay Street. They entered the intersection pursuant to a green light.

85.     As the Plaintiffs were traveling through the intersection, with at least nine other vehicles simultaneously traveling both east and west on Orleans Street in that same intersection, Defendant Johnson entered the intersection from the south, traveling on North Gay, with Defendants Jackson and Dollard shortly behind. At the time, neither Defendant Jackson nor Defendant Dollard had their emergency sirens activated.

86.     Defendant Johnson narrowly missed striking two vehicles, one in the right lane and one in the center lane of eastbound Orleans Street, before striking a vehicle in the far-left lane of eastbound Orleans, driven by an innocent third-party, Jordan Purnell.

87.     After Defendant Johnson struck Jordan Purnell's vehicle, Defendant Johnson's vehicle struck the rear driver's side wheel and quarter panel of Plaintiffs' vehicle, while

---

[29] Orleans Street is highly populated throughway in Baltimore City, and is part of US-40. The road cuts through both residential and commercial areas. Due to the mix of pedestrian density and traffic density, Baltimore City was set to conduct a traffic-calming study. *See* Clara Longo de Freitas, *City to conduct traffic calming study on Orleans Street*, BALT. BANNER, September 8, 2022, https://www.thebaltimorebanner.com/community/transportation/city-to-conduct-traffic-calming-study-on-orleans-street-X676ICT4ANGWVNO3LKPYXZQAT4/. North Gay Street is similarly populated, as the 300 block contains: (1) The Baltimore City Juvenile Justice Center, (2) the Juvenile Office of Public Defender, (3) a Parole and Probation office, and (4) a Holiday Inn. The 300 block also has two mid-block crosswalks due to the pedestrian density.
[30] Officer Jackson incorrectly stated they were approaching a redlight at North Avenue.

simultaneously forcing Jordan Purnell's vehicle across the double-yellow line. Jordan Purnell's vehicle struck the Plaintiffs' vehicle head on.

88.     As a result of these two impacts, Plaintiffs' vehicle turned 90-degrees, slowing to a near stop before being struck by another innocent third-party vehicle, driven by Jessica Seredich.

89.     After three impacts, Plaintiffs' vehicle finally came to a rest.

90.     The events detailed in Paragraphs 85 to 89 shall be, hereinafter, referred to as the "Crash."

91.     Following the Crash, Defendant Johnson exited the Odyssey and fled the scene on foot. Defendant Jackson initiated a foot pursuit and ultimately apprehended Defendant Johnson.

92.     Multiple BPD officers and supervisors convened on the scene following the crash. The officers can be seen and heard joking, congratulating Defendant Jackson, and minimizing the severe injuries of the innocent drivers involved in the Crash, including Plaintiffs.

93.     Defendant Johnson was subsequently arrested and charged with four (4) counts of violating Maryland Criminal Law § 4-203 (Wearing, Carrying, or Transporting Handgun); three (3) counts of violating Maryland Public Safety Law § 5-133 (Possessing a Firearm as a Prohibited Person), Maryland Criminal Law § 4-204 (Use of Firearm in Commission of a Felony); two (2) counts of violating Maryland Criminal Law § 5-621 (Use of Firearm in Relation to a Drug Trafficking Crime); one (1) count of violating Maryland Criminal Law § 5-602 (Possession with Intent to Distribute: Cocaine); and one count of violating Maryland Public Safety Law § 5-138 (Possessing a Stolen Firearm).

94.     Over a year later, on or about April 25, 2022, Defendant Johnson plead guilty to one count of violating Maryland Public Safety Law § 5-133 (Possessing a Firearm as a Prohibited

Person) and one count of violating Maryland Criminal Law § 4-203 (Wearing, Carrying, or Transporting Handgun in a Vehicle on a Public Road).

95.     Nearly three years later, at the time of the filing of this complaint, the Plaintiffs continue to suffer from injuries sustained during the Crash including, but not limited to severe nerve damage, soft-tissue injuries, post-concussive syndrome, depression, and post-traumatic stress disorder. The Plaintiffs have consulted countless doctors, underwent surgery, and altered their day-to-day lives in response to those injuries.

96.     Further, the Plaintiffs have been forced to lose time from work, miss out on family events, and alter their individual lives to accommodate the injuries sustained.

## IV.     FORESEEABILITY OF INJURY TO PLAINTIFFS

97.     The vehicular pursuit of Defendant Johnson directly and proximately caused the Crash occurring on March 9, 2021, which was foreseeable and preventable.

98.     Defendant Johnson's erratic driving was the direct result of being pursued.

99.     Defendant Johnson's only traffic violation prior to pursuit was allegedly reversing on a one-way street.[31]

100.     Defendant Johnson began driving erratically when Officer Defendants attempted to stop his vehicle.

101.     When Defendants Leak, Tobjy, and Craig stopped pursuing Defendant Johnson, leaving only Foxtrot to follow, Defendant Johnson drove with traffic, maintaining a safe distance between his vehicle and others, and stopping at traffic lights.

102.     However, when Defendants Jackson and Dollard attempted to stop Defendant Johnson, Defendant Johnson immediately began to speed, bring his vehicle within unsafe distances

---

[31] Following the pursuit, Defendant Johnson was not cited with any traffic violations in relation to his driving prior to, or during, the pursuit.

of other vehicles, and ignore red traffic lights – including the red light at the intersection of North Gay Street and Orleans Street.

103.    Therefore, Officer Defendants' vehicle pursuit of Defendant Johnson was the direct and proximate cause of the Crash at North Gay Street and Orleans Street.

104.    Further, BPD Defendants knew or should have known of the general dangers surrounding vehicle pursuits. These dangers are highlighted by the language of BPD's Policy 1503.[32]

105.    Officer Defendants repeatedly violated the requirements of Policy 1503 during the about ten-minute pursuit of Defendant Johnson. These violations include, but are not limited to:

   a. Initiating a pursuit of Defendant Johnson who, at the start of the pursuit, was wanted for a traffic offense without imminent danger;[33]
   b. Failing to communicate the proper reason for pursuing Defendant Johnson;[34]
   c. Failing to use any de-escalation tactics;[35]
   d. Failing to avoid escalation;[36]
   e. Failing to intervene to prevent abusive conduct;[37]
   f. Failing to properly consider the time of day;[38]
   g. Failing to properly consider the density of vehicular and pedestrian traffic;[39]
   h. Failing to properly consider the innocent passenger of Defendant Johnson's vehicle;[40] and
   i. Failing to terminate the pursuit when instructed to do so.[41]

106.    Officer Defendants knew or should have known that failing to abide by the requirements of Policy 1503 posed an unreasonable risk to innocent civilians.

---

[32] See Paragraph 59, supra.
[33] See Paragraphs 66, 68-69, supra.
[34] See Paragraph 74, supra.
[35] See Paragraphs 68-80, supra, generally.
[36] See Paragraphs 72-80, supra.
[37] See Paragraphs 68-80, supra, generally.
[38] See Paragraph 65, supra.
[39] See Paragraph 72, supra. See also, Fn. 28, supra.
[40] See Paragraph 67, supra.
[41] See Paragraph 77(b), supra.

107.    BPD Defendants knew or should have known of previous crashes resulting from vehicles pursuits conducted by BPD and other law enforcement agencies around the country,

108.    BPD Defendants knew or should have known the general dangers of vehicles driving at high rates of speed while failing to abide by traffic laws; it is foreseeable that a vehicle failing to abide by traffic laws will cause a crash.

109.    The Crash involving Plaintiffs was foreseeable, and was directly and proximately caused by the vehicle pursuit of Defendant Johnson.

**COUNT I**
**42 U.S.C. § 1983 – Violation of 14th Amendment**
**(Against Officer Defendants)**

110.    The foregoing and all other paragraphs herein are incorporated by reference as if fully set forth.

111.    42 U.S.C. § 1983 provides that,

Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected to any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the constitution and law shall be liable to the party injured in an action at law, in suit, in equity, or other appropriate proceeding for redress…

112.    The Officer Defendants, at all times relevant to this action, were acting under the color of state law as agents of the Baltimore Police Department.

113.    Plaintiffs have a clearly established right to bodily integrity under the Fourteenth Amendment. Civilian injury during an inherently dangerous police pursuit has been established as a violation of the Fourteenth Amendment.

114.    On March 9, 2021, Officer Defendants engaged in a high-speed pursuit in an attempt to apprehend a suspect alleged to have committed a minor traffic violation.

115.    Officer Defendants knew or should have known that: (1) the pursuit of a suspect wanted solely for a traffic violation is prohibited; (2) the suspect had an innocent passenger in his vehicle; (3) high-speed pursuits pose a significant risk to innocent bystanders and drivers; (4) continuing to pursue the suspect was likely to cause them to drive more carelessly and increase safety risks to the public in the vicinity;[42] (5) Foxtrot maintained full visual of the suspect at the time of the pursuit; (6) Defendant Johnson was traveling through densely populated areas of downtown Baltimore City; (7) the pursuit occurred at the start of rush hour on a Tuesday afternoon; and (8) innocent civilians did not have notice of the pursuit as the Officer Defendants failed to utilize their emergency sirens.

116.    Each of the Officer Defendants caused Defendant Johnson's vehicle to strike the Plaintiffs' vehicle by: (1) initiating and re-initiating a pursuit; (2) failing to utilize emergency sirens; and (3) failing to intervene.

117.    By initiating, continuing, and reinitiating a high-speed police pursuit, Officer Defendants created and increased the risk of danger to innocent bystanders and vehicle passengers in the vicinity of the pursuit, including Plaintiffs.

118.    Prior to the initial pursuit, Defendant Johnson allegedly reversed his vehicle on a one-way street. Though it is arguable as to whether this conduct even constitutes a traffic violation, Defendant Johnson was not posing any significant risk to other motorists on the street. Defendant Johnson only became a threat to other motorists when police initiated an illegal pursuit.

---

[42] This point is especially concerning in comparing Defendant Johnson's driving throughout the pursuit. When Officer Defendants initially attempted the traffic stop, Defendant Johnson drove erratically to evade the Officer Defendants. When Defendants Leak, Tobjy, and Craig stopped their pursuit, allowing Foxtrot to follow Defendant Johnson, Defendant Johnson drove with traffic – he stopped at redlights and drove at speeds comparable to other drivers in the area, particularly after exiting Interstate 83. When Defendants Jackson and Dollard took their turn attempting to pull over Defendant Johnson, he again began driving erratically. Nonetheless, Defendants Jackson and Dollard continued their re-initiation of the pursuit.

119.    The threat to other motorists ended when Officer Defendants backed off. With only Foxtrot overhead, Defendant Johnson did not pose a risk to other motorists as he stopped at red lights, traveled with the speed of traffic, and obeyed other traffic control devices.

120.    However, that threat was reinitiated when Officer Defendants again pursued Defendant Johnson, and continued until the Crash.

121.    Further, during the pursuit, Officer Defendants failed to utilize their emergency sirens which would have provided a clear warning to innocent civilians. Plaintiffs were not afforded a warning and, therefore, were not afforded an opportunity to avoid impact.

122.    The Crash would not have occurred Therefore, the Crash was the natural and foreseeable consequences of the Officer Defendants' actions.

123.    By initiating, continuing, and reinitiating a high-speed police pursuit, in direct contradiction to Policy 1503's express directives, the Officer Defendants were intentionally misusing their vehicles by engaging in a pursuit that was not necessary in its purpose nor in the manner that it was executed.

124.    By initiating, continuing, and reinitiating the high-speed pursuit, Officer Defendants directly and proximately caused the Crash and subsequent injuries to Plaintiffs.

125.    Officer Defendants' conduct by initiating, continuing, and reinitiating the highspeed pursuit displays a reckless disregard for Plaintiffs' right to bodily integrity. Plaintiffs continue to suffer from injuries related to this violent Crash.

WHEREFORE, Plaintiffs pray for judgment in their favor against Officer Defendants, in the amount of Five Million Dollars ($5,000,000.00) plus costs, and such other relief which the Court deems appropriate, including costs and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988, and punitive damages.

24

## COUNT II
## 42 U.S.C. § 1983 – Violation of 14th Amendment: Duty to Intervene
## (Against Officer Defendants)

126.    The foregoing and all other paragraphs herein are incorporated by reference as if fully set forth.

127.    Officer Defendants, along with other Baltimore City Police Department officers, violated Plaintiffs' rights including, but not limited to, the Plaintiffs' right to bodily integrity.

128.    As police officers, Officer Defendants had a duty to intervene to prevent the violation of this right by a fellow officer.

129.    Each of the Officer Defendants had a reasonable opportunity to intervene.

130.    Each of the Officer Defendants failed to intervene. These failures to intervene include, but are not limited to:

   a.  Defendants Leak and Tobjy failing to stop the initial pursuit of Defendant Johnson, despite knowing he was only wanted for a minor traffic violation;
   b.  Defendants Craig, Leak, and Tobjy failing to correct the statement concerning the basis for stopping and pursuing Defendant Johnson to Foxtrot;[43] and
   c.  Defendants Dollard and Gibbs failing to stop the re-initiation of the pursuit.

131.    As a direct and proximate result of the aforesaid conduct, Officer Defendants were a direct and proximate cause of the Crash, resulting in injury to Plaintiffs in violation of their right to bodily integrity under the 14th Amendment.

WHEREFORE, Plaintiffs pray for judgment in their favor against Officer Defendants, in the amount of Five Million Dollars ($5,000,000.00) plus costs, and such other relief which the Court deems appropriate, including costs and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988, and punitive damages.

---

[43] It is unclear, at this current time, which of the three officers made the statement. However, it is known that it was made by one of these three defendants and that all three were within the same vehicle with a radio capable of communicating with Foxtrot.

## COUNT III
## 42 U.S.C. § 1983 – *Monell* Liability: Condonation Theory
## <u>(Against Defendant BPD)</u>

132.    The foregoing and all other paragraphs herein are incorporated by reference as if fully set forth.

133.    Though the express language of Policy 1503 has been approved by federal courts pursuant to the Consent Decree, BPD maintained a custom, policy and/or practice of condoning its officers' conduct in improperly applying, or otherwise failing to abide by the requirements of, Policy 1503, creating a separate implied policy.

134.    Upon information and belief, discussed *infra*, BPD has failed to implement training on Policy 1503, permitting its officers to continue to improperly apply and violate Policy 1503 when engaging in emergency vehicle pursuits.

135.    Upon information and belief, discussed *infra*, BPD has failed to implement supervision of the application of Policy 1503, permitting its officers to continue to improperly apply and violate Policy 1503 when engaging in emergency vehicle pursuits.

136.    Prior to the Crash, BPD had actual knowledge of innocent civilians' deaths and injuries as a result of emergency vehicular pursuits resulting from the improper application of Policy 1503. BPD was aware of the lawsuits against it and its officers stemming from some of these pursuits.

137.    BPD has failed to put a stop to or correct the widespread pattern of its officers' unconstitutional conduct.

138.    By condoning the improper application of Policy 1503, BPD permitted continued constitutional injury to innocent civilians.

139.    As a direct and proximate result of the aforesaid condonation, Officer Defendants engaged in a pursuit that posed extreme inherent risk to innocent civilians and were, ultimately, a

direct and proximate cause of the Crash, resulting in injury to Plaintiffs in violation of their right to bodily integrity under the 14th Amendment.

140.    The actions of BPD officers, supervisors, and Defendant Harrison, following the Crash reiterated this condonation. Following the Crash, BPD officers may be seen laughing about the pursuit, attempting to minimize the severity of Plaintiffs' injuries, and congratulating Defendant Jackson.   Supervisors, including Defendant Harrison, arrive on scene and fail to question or discipline any of the involved Officer Defendants. Upon information and belief, none of the involved Officer Defendants were ever disciplined for the improper application of Policy 1503.

141.    BPD's condonation of the improper application of Policy 1503 was the moving force in Plaintiffs' injuries as BPD's condonation made it all but certain that Plaintiffs, or similarly situated civilians, would be injured by the actions of BPD Officers.

WHEREFORE, Plaintiffs pray for judgment in their favor against Defendant BPD, in the amount of Five Million Dollars ($5,000,000.00) plus costs, and such other relief which the Court deems appropriate, including costs and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988, and punitive damages.

**COUNT IV**
**42 U.S.C. § 1983 – *Monell* Liability: Failure to Train**
**(Against Defendant BPD)**

142.    The foregoing and all other paragraphs herein are incorporated by reference as if fully set forth.

143.    On or about July 23, 2020, less than a year prior to the fateful day giving rise to this instant case, Defendant BPD came before this Honorable Court to provide a quarterly update on the mandate reform progress, following the implementation of the Consent Decree. During that update, Assistant City Solicitor Lisa Walden noted, "Additional training that is currently *under*

*development* or *scheduled for delivery*, either in the classrooms, remotely, or by way of online learning includes…vehicle pursuits…"[44]

144.    On or about September 30, 2020, less than six months prior to the Crash, pursuant to the Consent Decree scheduling order, the "Baltimore Consent Decree Monitoring Team: First Comprehensive Re-Assessment" was filed.[45]

145.    The Re-Assessment noted, "BPD successfully completed revisions to its use of force policies. These policies include the core policy on use of force, Policy 1115, as well as 13 other policies."[46] One of the thirteen other policies listed includes Policy 1503.[47] Thus, it is clear, for the purposes of the Consent Decree overhaul, Policy 1503 was to be included in the use of force policies.

146.    The Re-Assessment went on to note, "BPD successfully completed Department-wide training on its revised use of force policies (UOF/FIP I) in October 2019."[48]

147.    However, BPD's Use of Force/Fair & Impartial Policing I Training (UOF/FIP I) includes two components: (1) a three-module e-learning course introducing the substantive requires of the new use of force policies, and (2) a two-day, in-class instruction course.[49] The training included six course modules/topics: (1) use of force and police legitimacy, (2) use of force

---

[44] Transcript of Proceedings, July 23, 2020, at 99, *United States of America v. Baltimore Police Department, et al.* JKB-17-0099 (emphasis added).
[45] Baltimore Consent Decree Monitoring Team: First Comprehensive Re-Assessment, September 30, 2020, *United States of America v. Baltimore Police Department, et al.* JKB-17-0099, ECF No. 342-1.
[46] *Id.* at 54.
[47] *Id.*
[48] *Id.* This is seemingly in contradiction to Lisa Walden's statements included in Paragraph 136.
[49] Baltimore Police Department Consent Decree Monitoring Team, *Compliance Review & Outcome Assessment Regarding BPD Training,* 23, (February 2022), available at
https://static1.squarespace.com/static/59db8644e45a7c08738ca2f1/t/620baaeef3d87d26a911631f/1644931828191/BPD+Training+Assessment--February+2022.pdf.

Policy 1115 updates, (3) de-escalation, (4) critical decision making module, (5) baton re-certification training, and (6) live use of force scenario.[50]

148.    Upon information and belief, neither the use of force training nor any other training module includes training on Policy 1503.[51]

149.    BPD's failure to train was the moving force in Plaintiffs' injuries as BPD's failure to train on how to properly evaluate, initiate, and engage in emergency vehicular pursuits made it all but certain that Plaintiffs, or similarly situated civilians, would be injured by the actions of BPD Officers.

WHEREFORE, Plaintiffs pray for judgment in their favor against Officer Defendants, in the amount of Five Million Dollars ($5,000,000.00) plus costs, and such other relief which the Court deems appropriate, including costs and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988, and punitive damages.

## COUNT V
## 42 U.S.C. § 1983 – *Monell* Liability: Failure to Supervise
## (Against BPD)

150.    The foregoing and all other paragraphs herein are incorporated by reference as if fully set forth.

151.    On or about September 30, 2020, less than six months prior to the Crash, the Monitoring Team expressed,

---

[50] *Id.* 27.

[51] *See Revised First Year Monitoring Plan*, September 13, 2018, *United States of America v. Baltimore Police Department, et al.* JKB-17-0099, ECF No. 138-1 at 14-15 (listing the various use of force policies to be training, excluding Policy 1503); *BPD Training 2021: Use of Force Review & Discussion, Policy 1115* (last accessed March 2, 2024), available at https://public.powerdms.com/BALTIMOREMD/documents/903572 (discussing various use of force policies, excluding Policy 1503); *Baltimore Police Department – Education and Training Section, Lesson Plan* (last accessed March 2, 2024), available at https://www.baltimorepolice.org/transparency/bpd-policies/na-draft-2021-fair-impartial-policing-iiiuse-force1st-amendment-refresher (detailing the lesson plan for a refresher training on Fair & Impartial Policing III/Use of Force, but failing to mention Policy 1503); *Memorandum to the Public and BPD Members*, September 14, 2021, available at https://public.powerdms.com/BALTIMOREMD/documents/903273 (outlining the two-day in-person instruction course on use of force and fair and impartial policing, which does not include mention of Policy 1503).

> BPD must now hold officers and supervisors accountable to the revised use of force policies[52] on which they have been trained…BPD thus has a steep hill to climb to satisfy the Consent Decree's requirements on use of force data collection and analysis…The new policies will not take hold until these supervisors diligently review force incidents and force reporting, praise officers for upholding policy, counsel officers whose performance is inadequate, and discipline officers for misconduct.[53]

152.    On or about October 29, 2020, less than five months prior to the Crash, Defendant BPD came before this Honorable Court to provide a quarterly update on the mandate reform progress, following the implementation of the Consent Decree. During that update, Dave Cooper, representing the United States, noted,

> The Consent Decree requires a system to be put in place to identify problems that officers may be facing or showing early on, and prevent serious acts of misconduct from occurring. But to be effective, that type of system needs to be able to draw on a wide range of information that relates to officer performance. Things like uses of force, *vehicular pursuits*, training…[54]

153.    Still, five months prior to the Crash, Defendant BPD failed to implement proper supervision of vehicular pursuits.

154.    On or about January 21, 2021, less than two months prior to the Crash, Defendant BPD again came before this Honorable Court to provide a quarterly update. During that update, Cynthia Coe, representing the United States, expressed concerns that "BPD is still laying the foundation to have internal affairs functions that investigate misconduct and discipline officers who commit misconduct."[55]

---

[52] The use of force policies were to include Policy 1503. *See* Baltimore Consent Decree Monitoring Team: First Comprehensive Re-Assessment, September 30, 2020, *United States of America v. Baltimore Police Department, et al.* JKB-17-0099, ECF No. 342-1 at 54-55.

[53] *Id.* at 55.

[54] Transcript of Proceedings, October 29, 2020, at 36, *United States of America v. Baltimore Police Department, et al.* JKB-17-0099 (emphasis added).

[55] Transcript of Proceedings, January 21, 2021, at 17, *United States of America v. Baltimore Police Department, et al.* JKB-17-0099.

155.    BPD's failure to supervise was the moving force in Plaintiffs' injuries as BPD's failure to supervise and correct officer misconduct made it all but certain that Plaintiffs, or similarly situated civilians, would be injured by the actions of BPD Officers.

WHEREFORE, Plaintiffs pray for judgment in their favor against Defendant BPD, in the amount of Five Million Dollars ($5,000,000.00) plus costs, and such other relief which the Court deems appropriate, including costs and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988, and punitive damages.

**COUNT VI**
**42 U.S.C. § 1983 – Violation of 14th Amendment: Supervisory Liability**
**(Against Defendant Harrison)**

156.    The foregoing and all other paragraphs herein are incorporated by reference as if fully set forth.

157.    Defendant Harrison was the Commissioner of Baltimore Police Department from March 12, 2019, until June 8, 2023.

158.    As Commissioner, Defendant Harrison supervised all BPD employees.

159.    As Commissioner, Defendant Harrison was a policymaker responsible for implementing and enforcing BPD policy regarding the termination or continuation of emergency vehicular pursuits. His failure to take action to correct his subordinates' conduct amounted to tacit authorization of officers engaging in emergency pursuits without consideration of civilian risk.

160.    As Commissioner, Defendant Harrison failed to act by failing to correct the improper application of Policy 1503 by BPD officers.

161.    Prior to the Crash, Defendant Harrison was aware of the Report issued by the Department of Justice wherein it was noted that BPD's pursuits and use of force policies mutually reinforced one another in a way that endangered the citizens of Baltimore.[56]

162.    Prior to the Crash, Defendant Harrison knew, should have known, or was otherwise deliberately indifferent to the Consent Decree Monitoring Team's continued concern regarding the training and supervision of BPD officers' use of force.

163.    Prior to the Crash, Defendant Harrison knew, should have known, or was otherwise deliberately indifferent to the fact that at least three innocent civilians were severely injured or killed during BPD vehicle pursuits during his tenure as Commissioner.

164.    Prior to the Crash, Defendant Harrison knew, should have known, or was otherwise deliberately indifferent to the fact that at least four innocent civilians were severely injured or killed during BPD vehicle pursuits since the implementation of Policy 1503.

165.    Prior to the Crash, Defendant Harrison knew, should have known, or was otherwise deliberately indifferent to the failure to train and supervise BPD officers in relation to Policy 1503.

166.    Prior to the Crash, Defendant Harrison knew, should have known, or was otherwise deliberately indifferent to the fact that BPD officers routinely disobeyed Policy 1503, or otherwise failed to properly carry-out the requirements of Policy 1503 before, during, and after initiating vehicular pursuits.

167.    Despite this notice, Defendant Harrison failed to correct the behavior of his subordinate officers, whom he was fully aware were engaging in unconstitutional conduct when they initiated emergency vehicular pursuits. Upon information and belief, no BPD officer was

---

[56] Defendant Harrison was affirmatively aware of the Report as he was called on to review BPD's progress in implementing changes following the Report, as required by the Consent Decree, and was present at various court hearings required by the Consent Decree. *See United States of America v. Baltimore Police Department, et al.* JKB-17-0099.

disciplined for initiating any of the emergency pursuits listed in this Complaint, nor were any officers disciplined for their failure to consider factors including heightened risk to Baltimore citizens.

168.     Defendant Harris did not train, or instruct training of, any of the Officer Defendants in how to apply the factors to consider listed in Policy 1503, and permitted the trainings on use of force to be devoid of mention of Policy 1503.

169.     Defendant Harris had actual and constructive knowledge that officers failed to abide by the discretionary factors included in Policy 1503 and knew that officers routinely ignored the factors when initiating pursuits.

170.     Defendant Harris had actual and constructive knowledge that the officers' failure to consider these discretionary factors posed an unreasonable risk of injury to citizens, including Plaintiffs.

171.     Upon information and belief, Defendant Harrison made no changes to the language, training, or supervision of Policy 1503 during his tenure.

172.     This indifference and failure to act permitted BPD officers to continue implementing Policy 1503 in an improper manner, as they did on March 9, 2021, leading to Plaintiffs' injuries.

173.     The Crash would not have occurred had the Officer Defendants considered the discretionary factors intended to mitigate civilian risk during emergency vehicle pursuits.

WHEREFORE, Plaintiffs pray for judgment in their favor against Defendant Harrison, in the amount of Five Million Dollars ($5,000,000.00) plus costs, and such other relief which the Court deems appropriate, including costs and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988, and punitive damages.

**COUNT VII**
**Gross Negligence**
**(Against Officer Defendants)**

174.    The foregoing and all other paragraphs herein are incorporated by reference as if fully set forth.

175.    Officer Defendants acted recklessly with gross negligence and/or malice when they disobeyed, or otherwise improperly applied, Policy 1503, leading to the Crash that injured the Plaintiffs.

176.    Officer Defendants intentionally failed to carry out their duties as required by Policy 1503 when they initiated, engaged in, re-initiated, and failed to intervene in the pursuit of Defendant Johnson.

177.    The actions of the Officer Defendants affected the lives of the Plaintiffs. Each of the Plaintiffs feared not only for their own lives, but for the well-being of their family members as three members of the same family were involved in the violent crash.

178.    Officer Defendants knew or should have known that pursuing Defendant Johnson, in violation of Policy 1503, would cause injuries to innocent civilians, including Plaintiffs.

179.    Officer Defendants acted with gross negligence and/or malice by intentionally and knowingly violating Policy 1503 and supervisor orders, without cause or legal justification.

180.    Officer Defendants were acting with wanton and willful disregard of Plaintiffs' rights as if such rights did not exist when they initiated and continued a pursuit that posed great risk to the general public.

181.    Officer Defendants were eager to partake in a vehicle pursuit – proper or improper – for personal motives including praise from other Officers, as was made evident by the actions of Officer Defendants and other BPD officers following the Crash.

34

182.    By taking part in the illegal pursuit of Defendant Johnson, Officer Defendants demonstrated a purpose to deliberately and willfully injure Plaintiffs and similarly situated innocent civilians.

WHEREFORE, Plaintiffs pray for judgment in their favor against Officer Defendants, in the amount of Five Million Dollars ($5,000,000.00) plus costs, and such other relief which the Court deems appropriate, including costs and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988, and punitive damages.

## COUNT VIII
### Negligence
### (Against Defendant Johnson)

183.    The foregoing and all other paragraphs herein are incorporated by reference as if fully set forth.

184.    Defendant Johnson acted with negligence when he illegally entered the intersection of North Gay Street and Orleans Street, directly and proximately causing the Crash and injury to Plaintiffs and others.

185.    Defendant Johnson owed a duty to Plaintiffs to exercise due care by (1) operating his vehicle at a reasonable and prudent speed under circumstances then and there existing, (2) maintaining a proper lookout for other vehicles on the road, (3) maintaining a safe distance between his vehicle and other vehicles on the road, (4) obeying all traffic laws, signs, and devices, and (5) otherwise operating his vehicle in a reasonable and prudent manner.

186.    Defendant Johnson breached his duty by (1) traveling at speeds that exceeded the speed limit or otherwise were unreasonable for the circumstances then and there existing, (2) failing to maintain a proper lookout for other vehicles, (3) failing to maintain a safe distance between his vehicle and other vehicles on the road, (4) failing to stop for the red light at North Gay

Street and Orleans Street, and (5) otherwise operating his vehicle in a negligent and unreasonable manner.

187.    As a direct and proximate cause of Defendant Johnson's recklessness, carelessness, and negligence, Defendant Johnson caused the Crash and subsequent injuries to Plaintiffs.

WHEREFORE, Plaintiffs pray for judgment in their favor against Defendant Johnson, in the amount of Five Million Dollars ($5,000,000.00) plus costs, and such other relief which the Court deems appropriate, including costs and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988, and punitive damages.

## DEMAND FOR JURY TRIAL

Plaintiffs Carlene Jones, Talease Gaither, and Sharonda Finch hereby demand that the above-captioned matter be tried before a jury on all issues so triable.

Respectfully submitted,

/s/ Hannah M. Ernstberger
Hannah M. Ernstberger, #20513
SALLER, LORD, ERNSTBERGER, & INSLEY
10 South Street, 6th Floor
Baltimore, MD 21202
(410) 783-7945
hernstberger@sallerlaw.com
*Attorney for Plaintiffs*