IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| CARLENE JONES ET AL., | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | Civil No. 24-652-BAH |
| BALTIMORE POLICE DEPARTMENT ET AL., | * | |
| Defendants. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

## <u>MEMORANDUM OPINION</u>

Plaintiffs Carlene Jones ("Jones"), Talease Gaither ("Gaither"), and Sharonda Finch ("Finch") (collectively "Plaintiffs") brought suit against Baltimore Police Department Officers Clayton Leak ("Leak"), Matthew Tobjy ("Tobjy"), James Craig ("Craig"), Joshua Jackson ("Jackson"), Jared Dollard ("Dollard"), Andrew Gibbs ("Gibbs") (collectively "Officer Defendants"), then Baltimore Police Commissioner Michael Harrison ("Harrison"), the Baltimore Police Department ("BPD"), and Deandre Johnson ("Johnson") (collectively "Defendants") related to injuries Plaintiffs sustained after the Officer Defendants allegedly engaged in a car chase in pursuit of Johnson, culminating in a collision between Plaintiffs', Johnson's and other vehicles. ECF 1. Pending before the Court are two motions to dismiss: the Officer Defendants' motion to dismiss, or, in the alternative, for summary judgment, ECF 16 ("Officer Defendants' motion"), and Harrison's and the BPD's motion to dismiss, or in the alternative, for summary judgment, ECF 17 ("BPD's motion"). Plaintiffs filed an opposition to the Officer Defendants' motion, ECF 24, and the BPD's motion, ECF 26. The Officer Defendants replied, ECF 29, as did the BPD, ECF

28.[1]  Attached to the Officer Defendants' motion are two physical exhibits, Exhibit A, the body-worn camera ("BWC") of Defendant Jackson (hereinafter "Jackson BWC"), and Exhibit B, aerial surveillance video from Foxtrot, BPD's helicopter (hereinafter "Foxtrot Video"). *See* ECFs 16-2 and 16-3 (notices of filing physical exhibits); ECF 20 (paperless order granting motion for leave to file physical exhibits).  Plaintiffs also attached to their opposition to the Officer Defendants' motion, a physical exhibit, Exhibit A, BPD dispatch audio recording (hereinafter "Dispatch Audio"). *See* ECF 24-2 (notice of filing physical exhibit); ECF 27 (paperless order granting motion for leave to file physical exhibit).  The Court has reviewed all relevant filings and finds that no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2023).  Accordingly, for the reasons stated below, the Officer Defendants' motion, treated as a motion to dismiss is GRANTED as to the federal claims, the BPD's motion, treated as a motion to dismiss, is also GRANTED, and the Court declines to exercise supplemental jurisdiction over the state law claims.

## I.    BACKGROUND

### A.    Factual Allegations

These allegations, taken from the complaint, are accepted as true, and all reasonable inferences are drawn in Plaintiff's favor. *See E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011).  The Court also considers the physical exhibits, including the Jackson BWC, Foxtrot Video, and Dispatch Audio, to the extent permitted.  "[A] district court can consider a video submitted at the motion to dismiss stage when (1) the video is 'integral' to the complaint and its authenticity is not challenged, but (2) only to the extent that the video 'clearly depicts a set of facts contrary to those alleged in the complaint,' or 'blatantly contradicts' the

---

[1] The Court references all filings by their respective ECF numbers and page numbers by the ECF-generated page numbers at the top of the page.

plaintiff's allegations, rendering the plaintiff's allegations implausible." *Doriety for Est. of Crenshaw v. Sletten*, 109 F.4th 670, 679–80 (4th Cir. 2024) (quoting *Saalim v. Walmart, Inc.*, 97 F.4th 995, 1002 (6th Cir. 2024)). "As the phrase 'blatantly contradicts' implies, '[t]his standard is a very difficult one to satisfy' and requires that the plaintiff's version of events be 'utterly discredited' by the video recording." *Id.* at 679 (additional internal quotation marks omitted) (quoting *Lewis v. Caraballo*, 98 F.4th 521, 529 (4th Cir. 2024)).

On the afternoon of March 9, 2021, Plaintiffs, a mother, daughter, and niece, were leaving Johns Hopkins Hospital—Jones driving her 2013 BMW with Gaither in the front passenger seat and Finch in the backseat. ECF 1, at 4 ¶ 8, at 18 ¶ 84. Further north in the Cylburn neighborhood of Baltimore, Plaintiffs allege that Officers Craig, Leak, and Tobjy (hereinafter the "Initial Officers") "were conducting routine patrol" in their unmarked BPD vehicle, with Craig driving, Leak in the front passenger seat, and Tobjy in the rear passenger seat. *Id.* at 15 ¶ 67. The Initial Officers were "in the 4900 block of Laurel Avenue" when "Defendant Leak observed a grey Honda Odyssey, later determined to be driven by Defendant Johnson, reversing westbound in the 2800 block of West Garrison Avenue, a one-way road. The Odyssey had a cracked windshield." *Id.* ¶¶ 67–68 (footnote omitted). The complaint continues: "Defendant Leak activated emergency equipment to conduct a traffic stop of the Odyssey in the 4800 block of Laurel Avenue. The Odyssey failed to stop and began to accelerate 'in a clear attempt to elude officers.'" *Id.* ¶ 71. "Defendant Leak requested Foxtrot, BPD's aviation unit, for air support due to the 'erratic driving of the Honda.' The officers backed off 'do [*sic*] to the speed of the fleeing Honda van.'" *Id.* ¶ 72 (alterations in complaint) (quoting statement of probable cause).

Foxtrot located Johnson's vehicle and followed it as it entered onto I-83 southbound until it exited I-83 downtown. ECF 1, at 15–16 ¶¶ 72–74. Defendants Jackson, Dollard, and Gibbs

3

(hereinafter the "Downtown Officers") were patrolling downtown at the time, Jackson in his own vehicle and Dollard driving another with Gibbs in the passenger seat. *See id.* at 16 ¶ 77, at 17 ¶ 79(c). Johnson "traveled with traffic behind a third-party vehicle at normal traffic speed" until coming to a stop at a redlight at Holliday and East Lexington Streets behind a vehicle driven by a third party. *Id.* at 16 ¶ 74. "Defendant Johnson sat at the red light, behind traffic, for nearly a full minute while Foxtrot circled overhead and relayed his location in traffic over citywide dispatch." *Id.* ¶ 75. When Foxtrot asked why Johnson's vehicle was being followed, one of the Initial Officers (it is not clear who) "advised 'he was coming from the location in Park Heights where the shooting was in Northwest,' which dispatch relayed." *Id.* ¶ 76. Plaintiffs allege that "[t]his statement is false," *id.*, explaining that:

> The Cylburn neighborhood is separate and distinct from the Park Heights neighborhood. Upon information and belief, the shooting referenced occurred around 2:30 p.m. in the 4400 block of Park Heights, a mile from where officers first attempted to stop Defendant Johnson. Further, the shooting was also not referenced in Defendant Leak's Statement of Probable Cause. And the Officers later clarified after the crash that Defendant Johnson was not wanted in relation to that shooting.

*Id.* at n.28. When the traffic light at Holliday and East Lexington turned green, two third-party vehicles turn left onto East Lexington. *Id.* ¶ 77. Johnson, in the Odyssey, followed and "began to enter the intersection when Defendant [Officer] Jackson entered the intersection, from East Lexington Street, despite facing a red light. Defendant Johnson slowed, nearly stopping, before he ensured it was safe to proceed and made a left turn onto East Lexington Street." *Id.* "Defendant Johnson continued to travel safely at normal traffic speed before coming to a stop, again behind a third-party vehicle stopped at a redlight" at the intersection of East Lexington Street and Gay Street. *Id.* at 16–17 ¶ 78. "Defendant Jackson positioned his vehicle behind Defendant Johnson's" at the red light, where they sat for about forty-five seconds before the light changed. *Id.* at 17 ¶¶ 78–79.

During these forty-five seconds, Plaintiffs allege the following occurred:

(1) "Defendant Jackson announced over dispatch that he was behind the Odyssey";

(2) One of the Initial Officers "instructed Defendant Jackson to attempt to pull over the Odyssey. Another BPD Officer, thought to be Captain Jeffrey Featherstone, clarified over dispatch: 'Unit that is behind the vehicle, attempt to make a safe stop. Get him a back-up unit. If he takes off, Fox[trot] has him'"; and

(3) "Defendant Dollard arrived at the location and positioned his vehicle to the right of Defendant Jackson's vehicle. Defendant Gibbs was the front-seat passenger of Defendant Dollard's police vehicle."

ECF 1, at 17 ¶¶ 79(a)–(c). Once the light turned green, Defendant Johnson proceeded through the intersection turning left onto North Gay Street, and "Defendants Jackson and Dollard activated their lights. Defendant Jackson activated a 'yelp' sound from his vehicle, in an attempt to signal to Defendant Johnson instructions to pull over." *Id.* ¶ 80. Plaintiffs allege that at no point did Defendant Officers Jackson or Dollard "activate[] their full emergency sirens." *Id.* "Defendant Johnson, followed by Defendant Jackson and Defendant Dollard, sped northbound on North Gay Street through a redlight at the intersection with East Saratoga Street, then narrowly missed striking a stopped vehicle before proceeding through the intersection with Fallsway." *Id.* ¶ 81. "As the vehicles continued to accelerate through the 300 block of North Gay Street towards Orleans Street, Defendant Jackson radioed that they were approaching a redlight, and there would 'probably be an accident.'" *Id.* at 18 ¶ 82 (footnotes omitted).

As Plaintiffs headed westbound on Orleans Street and proceeded through a green light at the intersection with North Gay Street, Defendant Johnson ignored a red light, entered the intersection, struck an eastbound vehicle, which then, along with Johnson's vehicle, hit Plaintiffs' vehicle, causing it to "sp[i]n 90-degrees, before being struck by yet another vehicle and finally coming to a stop." ECF 1, at 4 ¶¶ 9–11. The Court takes judicial notice that the distance between the intersections of North Gay Street/East Lexington Street and North Gay Street/Orleans Street is

5

0.3 miles.[2] Plaintiffs allege that, as of the filing of the complaint in March 2024, they still suffer from the resultant injuries, including "severe nerve damage, soft-tissue injuries, post-concussive syndrome, depression, and post-traumatic stress disorder[,]" and "have consulted countless doctors, underwent surgery, and altered their day-to-day lives in response to those injuries." *Id.* at 20 ¶ 95.

After the accident, Defendant Johnson fled his vehicle and began running on foot, pursued, also on foot, by Defendant Jackson. ECF 1, at 19 ¶ 91. Defendant Johnson was apprehended and subsequently charged with four firearm and drug state offenses, ultimately pleading guilty to two firearm charges. *Id.* at 19–20 ¶¶ 93–94.

Plaintiffs allege that at the time of the crash, BPD Policy 1503 governed vehicle pursuits. *See* ECF 1, at 9 ¶ 40. That policy, which is attached to the complaint, authorizes BPD officers to engage in vehicle pursuits of "an eluding vehicle when":

> [1] The vehicle contains a felony suspect and failure to immediately apprehend poses an immediate threat of death or serious bodily injury to the member or others; and

> [2] Before the pursuit is initiated, there exists probable cause to believe the fleeing suspect committed a felony which resulted, or could have resulted, in death or serious bodily injury.

ECF 1-3, at 4. The policy directs officers to consider "both individually and collectively" a number of factors in determining whether to "initiate or continue a pursuit," including "[t]he safety of the public, including: the type of area, such as a school zone; time of day and lighting; weather, road conditions, and density of vehicular and pedestrian traffic; and the speed of the pursuit relative to

---

[2] "Courts may 'take judicial notice of a Google map and satellite image as a source whose accuracy cannot reasonably be questioned.'" *United States v. Ruffin*, 814 F. App'x 741, 755 n.2 (4th Cir. 2020) (additional internal quotation marks omitted) (quoting *Pahls v. Thomas*, 718 F.3d 1210, 1216–17 n.1 (10th Cir. 2013)) (collecting cases); *see also* Fed. R. Evid. 201.

these factors." *Id.* Per the policy, BPD officers are not to initiate a vehicle pursuit when "[t]he initial violation is a crime against property (including auto theft), misdemeanor, a traffic offense without imminent danger, or is a non-violent warrant," when "[t]he vehicle (marked or unmarked) is not equipped with lights and siren, or the lights and siren are malfunctioning, and when "[t]he risk of a Vehicle Pursuit outweighs the need to stop the Eluding driver." *Id.* After the events at issue in this case, on October 9, 2023, Plaintiffs allege that the BPD amended Policy 1503. ECF 1, at 12 ¶ 55. The amended policy now instructs that "[s]upervisors shall ask clarifying questions to determine whether" the two authorization factors listed above have been met. ECF 1-4, at 3.

Plaintiffs allege that nationwide statistics, as well as reported injuries resulting from police pursuits more locally in Maryland, demonstrate that injury or death to innocent bystanders is a foreseeable result of police pursuits, such as the one at issue here. ECF 1, at 10–14 ¶¶ 47–62.

### B.   Procedural History

Plaintiffs filed the instant suit on March 4, 2024, bringing eight counts. *See* ECF 1. Against the Officer Defendants, Plaintiffs allege (1) a violation of the Fourteenth Amendment pursuant to 42 U.S.C. § 1983 (count I), *id.* at 22–24 ¶¶ 110–25; (2) a violation of the Fourteenth Amendment pursuant to 42 U.S.C. § 1983 related to their duty to intervene (count II), *id.* at 25 ¶¶ 126–31; and (3) gross negligence (count VII), *id.* at 34–35 ¶¶ 174–82. Plaintiffs bring three *Monell* claims against the BPD under § 1983: (1) a condonation theory claim (count III), *id.* at 26–27 ¶¶ 132–41; (2) a failure-to-train claim (count IV), *id.* at 27–29 ¶¶ 142–49; and (3) a failure-to-supervise claim (count V), *id.* at 29–31 ¶¶ 150–55. Plaintiff also brings a Fourteenth Amendment supervisory liability claim under § 1983 against Harrison (count VI), *id.* at 31–33 ¶¶ 156–73, and a negligence claim against Johnson (count VIII), *id.* at 35–36 ¶¶ 183–87.

Attached to the complaint are four exhibits: (1) the Local Government Tort Claims Act ("LGTCA") notice, ECF 1-2; BPD Policy 1503, which was published November 24, 2019, and governed at the time of the incident giving rise to this complaint, ECF 1-3; Amended Policy 1503, which was drafted October 9, 2023, ECF 1-4; and the statement of probable cause against Johnson, ECF 1-5. On May 20, 2024, the Officer Defendants and the BPD filed their respective motions, ECFs 16 and 17, which are now ripe.[3]

### 1.   The Officer Defendants' Motion

The Officer Defendants argue that Plaintiffs have failed to state a claim upon which relief can be granted on the three counts against them, that the Officer Defendants are entitled to qualified immunity, and that, alternatively, they are entitled to summary judgment. *See* ECF 16-1, at 9–22. More specifically, the Officer Defendants argue that count I, the Fourteenth Amendment claim, must be dismissed because Plaintiffs have not alleged facts that "shock the conscience," which necessary to raise a substantive due process claim pursuant to *County of Sacramento v. Lewis*, 523 U.S. 833 (1998). *See* ECF 16-1, at 9–14. The Officer Defendants argue that the Fourteenth Amendment failure-to-intervene claim also fails because Plaintiffs have not alleged that any officer had a reasonable opportunity to intervene or knew that another officer was violating Plaintiffs' constitutional rights. *See id.* at 14–16. The Officer Defendants argue that Plaintiffs have not stated a claim for gross negligence against the Officer Defendants. *Id.* at 16–18. Even if the Court were to find that Plaintiffs have pled a constitutional claim, the Officer Defendants assert that they are entitled to qualified immunity. *See id.* at 18–19. Alternatively, the Officer Defendants

---

[3] Defendant Johnson appears to have been served on March 22, 2024. *See* ECF 13 (summons returned executed). Johnson has yet to answer or otherwise defend this case.

argue that even if the Court finds that Plaintiffs have stated a claim, they are entitled to summary judgment. *Id.* at 19–22.

Plaintiffs dispute these arguments. In opposition, Plaintiffs argue that the Officer Defendants "fabricated reasons to attempt a stop on Defendant Johnson." ECF 24-1, at 7 (capitalization omitted). Plaintiffs assert that they have stated a substantive due process claim under both the standard they believe is applicable and the one the Officer Defendants belief is applicable. *See id.* at 11–24. Plaintiffs further argue that they have stated facts sufficient to plead a failure-to-intervene claim as to each Officer Defendant, *id.* at 25–26, and a gross negligence claim, *id.* at 26–28. Plaintiffs further argue that the Officer Defendants are not entitled to qualified immunity because they have sufficiently pled a constitutional violation that was clearly established at the time of the facts giving rise to this litigation. *See id.* at 26–30. Plaintiffs agree that the Jackson BWC and Foxtrot Video (and the Dispatch Audio they submitted) may be treated as integral to the complaint such that the Court may consider them without converting the motion to one for summary judgment. *Id.* at 6 n.2. However, they also ask for a reasonable opportunity to complete discovery before the Court considers a motion for summary judgment. *See id.* at 6 n.2. In reply, the Officer Defendants maintain that Plaintiffs have not stated a claim upon which relief can be granted and that the video and audio evidence otherwise compels granting summary judgment in the Officer Defendants' favor. *See* ECF 29, at 2–10.

### 2. The BPD's Motion

The BPD argues that Plaintiffs' *Monell* and supervisory liability claims fall with the constitutional claims against the Officer Defendants. *See* ECF 17-1, at 11, 12–13. The BPD also argues that the factual allegations in the complaint otherwise do not support a supervisory liability against Harrison, *id.* at 8–11, or the *Monell* claims against the BPD, *id.* at 13–22. In reply, the

BPD reiterates that the claims against the BPD and Harrison must be dismissed along with the underlying constitutional claims against the Officer Defendants, and that they otherwise also fail on their own merit. ECF 28, at 1–6.

## II.    **LEGAL STANDARD**

Federal Rule of Civil Procedure 12(b)(6) governs dismissals for failure to "state a claim upon which relief can be granted." In considering a motion under this rule, courts discount legal conclusions stated in the complaint and "accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus,* 551 U.S. 89, 94 (2007); *see also Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). A court then draws all reasonable inferences in favor of the plaintiff and considers whether the complaint states a plausible claim for relief on its face. *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.,* 591 F.3d 250, 253 (4th Cir. 2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678.

"The complaint must offer 'more than labels and conclusions' or 'a formulaic recitation of the elements of a cause of action[.]'" *Swaso v. Onslow Cnty. Bd. of Educ.,* 698 F. App'x 745, 747 (4th Cir. 2017) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007)). At the same time, a "complaint will not be dismissed as long as [it] provides sufficient detail about [the plaintiff's] claim to show that [the plaintiff] has a more-than-conceivable chance of success on the merits." *Owens v. Balt. City State's Att'ys Off.,* 767 F.3d 379, 396 (4th Cir. 2014).

When presented with a motion to dismiss or, in the alternative, a motion for summary judgement, the disposition of the motion "implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure." *Pevia v. Hogan,* 443 F. Supp. 3d 612, 625 (D. Md. 2020). "If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must [generally]be treated as one for summary judgment under

Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d).

At the same time, the Court may consider "documents attached to the complaint, 'as well as those attached to the motion to dismiss, so long as they are integral to the complaint and authentic.'" *Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019) (quoting *Philips v. Pitt Cnty. Mem. Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009)). A document is "integral" when "its 'very existence, and not the mere information it contains, gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011) (citation omitted) (emphasis omitted). As noted above, the Court can consider video (and audio) evidence at the motion to dismiss stage if that media is integral to the complaint, its authenticity is not in dispute, but only if it blatantly contradicts the complaint's allegations. *See Doriety*, 109 F.4th at 679–80.

## III. ANALYSIS

As an initial matter, the Court will exercise its discretion and treat both motions as motions to dismiss. While all parties agree that the Jackson BWC, Foxtrot Video, and Dispatch Audio are integral to the complaint and may be considered on a motion to dismiss, the Court will only consider them to the extent they directly contravene Plaintiffs' complaint. *See Doriety*, 109 F.4th at 679–80. Because the physical exhibits do not appear to directly contravene the complaint, they are of little import to the Court's analysis, which focuses on the sufficiency of the allegations in the complaint.

### A. Officer Defendants

#### 1. Fourteenth Amendment Substantive Due Process

42 U.S.C. § 1983 provides "a method for vindicating federal rights." *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quotation omitted). It allows suits against any "person" acting under

color of state law who subjects the claimant to "the deprivation of any rights, privileges, or immunities secured by the Constitution." 42 U.S.C. § 1983. The Due Process Clause of the Fourteenth Amendment prohibits "any State [from] depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV § 1. "[T]he Due Process Clause contains a substantive component that bars certain arbitrary, wrongful government actions . . ." and an alleged violation thereof is actionable under § 1983. *Zinermon v. Burch*, 494 U.S. 113, 125 (1990); *see also Wolff v. McDonnell*, 418 U.S. 539, 558 (1974) (noting that "[t]he touchstone of due process is protection of the individual against arbitrary action of government").

The Supreme Court's "cases dealing with abusive executive action," including alleged police misconduct, "have repeatedly emphasized that only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense[.]'" *Lewis*, 523 U.S. at 846 (quoting *Collins v. Harker Heights*, 503 U.S. 115, 129 (1992)). Executive conduct must "shock[] the conscience" to be an actionable substantive due process challenge. *See id.*; *see also Dean for & on behalf of Harkness v. McKinney*, 976 F.3d 407, 413–14 (4th Cir. 2020) ("The parties agree that this 'shocks the conscience' standard applies to § 1983 claims alleging a violation of substantive due process based on alleged police misconduct." (citing *Temkin v. Frederick Cty. Comm'rs*, 945 F.2d 716, 722 (4th Cir. 1991))).

"The Supreme Court in *Lewis* described a 'culpability spectrum' along which behavior may support a substantive due process claim." *Dean*, 976 F.3d at 414 (quoting *Lewis*, 523 U.S. at 848–49). Negligent police misconduct does not shock the conscience and "is categorically beneath the threshold of constitutional due process." *Lewis*, 523 U.S. at 849 (citing, e.g., *Daniels v. Williams*, 474 U.S. 327, 328 (1986)). "[C]onduct intended to injure in some way unjustifiable by any government interest" lies at the other end of the culpability spectrum and is "most likely to

rise to the conscience-shocking level." *Id.* at 849 (citing *Daniels*, 474 U.S. at 331). This intent-to-harm standard applies "when unforeseen circumstances demand an officer's instant judgment, [such that] even precipitate recklessness fails to inch close enough to harmful purpose to spark the shock that implicates 'the large concerns of the governors and the governed.'" *Id.* at 853 (quoting *Daniels*, 474 U.S. 332).

In the middle of the spectrum lies conduct that is deliberately indifferent—"'an intermediate level of culpability' that can, if proven, also establish a due process violation." *Dean,* 976 F.3d at 415 (quoting *Lewis*, 523 U.S. at 848–49). "Deliberate indifference that shocks in one environment may not be so patently egregious in another, and our concern with preserving the constitutional proportions of substantive due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience shocking." *Lewis*, 523 U.S. 850. "[U]nlike the intent-to-harm standard, th[e deliberate indifference] standard 'is sensibly employed only when actual deliberation is practical.'" *Dean*, 976 F.3d at 415 (citing *Lewis*, 523 U.S. at 851). "Certainly, time to 'reflect on [one's] actions' is a factor in determining whether deliberate indifference is the appropriate standard." *Id.* (quoting *Browder v. City of Albuquerque*, 787 F.3d 1076, 1082 (10th Cir. 2015) (Gorsuch, J.)). "[W]hen an officer is able to make unhurried judgments with time to deliberate, such as in the case of a non-emergency, deliberate indifference is the applicable culpability standard for substantive due process claims involving driving decisions." *Id.* (citing *Lewis*, 523 U.S. at 853).

In addition to detailing this culpability spectrum applicable to substantive due process claims writ large, *Lewis* is also the Supreme Court's seminal substantive due process case stemming from a police officer's actions during a vehicle pursuit. There, a sheriff's deputy and another officer were in their stopped vehicles having just responded to an unrelated call when they

saw a speeding motorcycle carrying two people. *Lewis*, 523 U.S. at 836. One officer activated his

emergency lights, yelled for the motorcycle to stop, and attempted to block the motorcycle's path

with his car. *Id.* When the motorcycle evaded the police cars and sped off, the other officer

activated his emergency lights and siren and "began pursuit at high speed." *Id.* at 837.

> For 75 seconds over a course of 1.3 miles in a residential neighborhood, the
> motorcycle wove in and out of oncoming traffic, forcing two cars and a bicycle to
> swerve off the road. The motorcycle and patrol car reached speeds up to 100 miles
> an hour, with [the officer] following at a distance as short as 100 feet; at that speed,
> his car would have required 650 feet to stop.

*Id.* As the motorcycle attempted to make "a sharp left turn," it "tipped over" knocking both riders

off. *Id.* "By the time [the officer] slammed on his brakes, [the driver] was out of the way, but [the

passenger] was not. The patrol car skidded into him at 40 miles an hour, propelling him some 70

feet down the road and inflicting massive injuries." *Id.* That passenger, Lewis, a sixteen-year-old

boy, "was pronounced dead at the scene." *Id.* Lewis's parents brought a substantive due process

claim under § 1983 on his behalf against the officer who struck him.

    A unanimous Supreme Court rejected a finding of liability against the officer under § 1983

for the tragic collision.[4] *Id.* at 855. The Court applied the intent-to-harm standard and found that

the pursuing officer did not violate Lewis's Fourteenth Amendment substantive due process rights.

*Id.* The Court reasoned that the officer

> was faced with a course of lawless behavior for which the police were not to blame.
> They had done nothing to cause [the driver's] high-speed driving in the first place,
> nothing to excuse his flouting of the commonly understood law enforcement
> authority to control traffic, and nothing (beyond a refusal to call off the chase) to

---

[4] The majority found that the officer did not violate Lewis's substantive due process rights under
the intent-to-harm standard. *Lewis*, 523 U.S. at 854–55. Justice Stevens and Justice Scalia, joined
by Justice Thomas, concurred separately only in the judgment. *See id.* at 859, at 860. Justice
Stevens would not have considered the constitutional question but nonetheless would have decided
that qualified immunity protected the officer from liability. *Id.* at 859 (Stevens, J., concurring in
the judgment). Justices Scalia and Thomas would have found that there is no such substantive due
process right at all. *See id.* at 862–63 (Scalia, J., concurring in the judgment).

> encourage him to race through traffic at breakneck speed forcing other drivers out
> of their travel lanes. [The driver's] outrageous behavior was practically
> instantaneous, and so was [the pursuing officer's] instinctive response. While
> prudence would have repressed the reaction, the officer's instinct was to do his job
> as a law enforcement officer, not to induce [the driver's] lawlessness, or to terrorize,
> cause harm, or kill. Prudence, that is, was subject to countervailing enforcement
> considerations, and while [the officer] exaggerated their demands, there is no
> reason to believe that they were tainted by an improper or malicious motive on his
> part.

*Id.* at 855. The *Lewis* Court "h[e]ld that high-speed chases with no intent to harm suspects

physically or to worsen their legal plight do not give rise to liability under the Fourteenth

Amendment, redress[a]ble by an action under § 1983." *Id.* at 854. "[I]n a footnote, the Court

[also] stated that there may be a different result where 'a citizen suffers or is seriously threatened

with physical injury due to a police officer's intentional misuse of his vehicle.'" *Corbitt v. Balt.

City Police Dep't*, 675 F. Supp. 3d 578, 588–89 (D. Md. 2023) (citing *Lewis*, 523 U.S. at 854

n.13). With this background in mind, the Court evaluates the sufficiency of Plaintiffs' substantive

due process claim.

Here, the parties disagree which standard applies in this case. The Officer Defendants

argue that the intent-to-harm standard applies, relying squarely on *Lewis*. *See* ECF 16-1, at 10–

14. Plaintiffs, by contrast, contend that Officer Defendants here had time to deliberate, so the

deliberate indifference standard applies. *See* ECF 24-1, at 12–16. At the same time, they offer no

real attempt to distinguish the present case from the facts of *Lewis*. They assert that "[t]hough

most high-speed police chases apply the 'intent to harm' standard, the police pursuit giving rise to

Plaintiffs' claims does not require a showing of culpability above deliberate indifference when an

analysis of the context and circumstances is conducted." *Id.* at 12. Plaintiffs then jump directly

to the application of the deliberate indifference standard, arguing that the Officer Defendants were

15

aware of the substantial risk of harm in engaging in a pursuit and that the Initial Officers and the Downtown Officers all had the opportunity to deliberate before acting. *Id.* at 12–16.

> i.    *The Intent-to-Harm Standard Applies.*

In *Dean*, the Fourth Circuit confronted when to apply deliberate indifference standard versus the intent-to-harm standard on a substantive due process claim where the plaintiff was injured in a car accident with a police officer. There, the plaintiff's vehicle was struck by a vehicle driven by defendant deputy sheriff who was travelling at least 83 miles per hour on a dark unlit road with a speed limit of 45 miles per hour. *Dean*, 976 F.3d at 412. The deputy sheriff had initially been responding to a call to assist another office with an emergency, but the emergency call had been terminated prior to the collision. *Id.* at 412, 415–16. The *Dean* court concluded the deliberate indifference standard applied at the summary judgment stage on the facts there because a reasonable jury could find that the deputy sheriff "was not responding to an emergency and had time to deliberate his actions." *Id.* at 415–16. Critical to the court's analysis were the facts that when after the emergency response call was called off, the deputy sheriff deactivated his emergency lights and siren, and two minutes and fifteen seconds passed before he collided with the plaintiff's vehicle. *Id.*

In order to conduct the requisite exacting analysis and determine which standard applies here—and whether the Officer Defendants' conduct meets the applicable standard—the Court will evaluate the actions of the Initial Officers and the Downtown Officers separately.[5]  Plaintiffs' argument that the deliberate indifference standard applies to the Initial Officers rests on the premise that the Initial Officers' attempted stop and resulting pursuit, Foxtrot's surveillance, and the

---

[5] It is also worth noting that only Defendants Craig, Jackson, and Dollard were driving vehicles. *See* ECF 1, at 15 ¶ 67, at 16 ¶ 77, at 17 ¶ 79(c). Any claim against the passenger officers (Tobjy, Leak, and Gibbs) for alleged misuse of a police vehicle necessarily fails against them.

Downtown Officers' attempted stop and resulting pursuit are one continuous chase, during which the Initial Officers had time to deliberate before taking an action that led to Plaintiffs' injuries. *See* ECF 24-1, at 14 ("Six minutes passed between Foxtrot first locating Defendant Johnson's vehicle on Interstate 83 and Defendant Jackson positioning his vehicle behind Defendant Johnson's vehicle. *See* Foxtrot Video. Six minutes is an abundance of time to deliberate the continued pursuit of Defendant Johnson."). But the allegations in the complaint bely this reading of the events. The complaint does not allege any facts from which the Court could differentiate the circumstances surrounding the Initial Officers' attempted stop of Johnson from the circumstances in *Lewis* that led the Court to apply the intent-to-harm standard (and to conclude that the plaintiffs did not meet that standard). Rather, Plaintiffs' complaint acknowledges that the Initial Officers mitigated the risk of harm presented by a pursuit, essentially breaking the causal chain between Initial Officers' initial pursuit and the resulting harm:

> The threat to other motorists ended when [Initial] Officer Defendants backed off. With only Foxtrot overhead, Defendant Johnson did not pose a risk to other motorists as he stopped at red lights, traveled with the speed of traffic, and obeyed other traffic control devices. However, that threat was reinitiated when [Downtown] Officer Defendants again pursued Defendant Johnson, and continued until the Crash.

ECF 1, at 24 ¶¶ 119–20. Plaintiffs have pled that "[a]nother BPD Officer, *thought to be Captain Jeffrey Featherstone*, clarified over dispatch: 'Unit that is behind the vehicle, attempt to make a safe stop. Get him a back-up unit. If he takes off, Fox[trot] has him.'" ECF 1, at 17 ¶ 79(b) (emphasis added). The Initial Officers were not present downtown, did not participate in the attempted second stop, and did not pursue Johnson on North Gay Street after he again fled the Downtown Officers' attempted traffic stop.

To the extent Plaintiffs argue in the opposition that the Initial Officers' unlawful and deliberately indifferent act was the allegedly false statement that Johnson's vehicle was wanted

because it was coming from the area of a shooting, the allegations in the complaint surrounding this statement do not rise to the level of conscience-shocking necessary to state a substantive due process claim, and in any case, the statement too attenuated from the actual harm suffered by Plaintiffs.[6]. While Plaintiffs allege that this statement was untrue, the fact remains that the statement only led to an attempted stop of Johnson's vehicle. Once Johnson fled (again) from that attempted stop, only then did a pursuit by the Downtown Officers ensue—a pursuit which lasted no more than 0.3 miles. These facts, with all inferences drawn in Plaintiffs' favor, do not support applying the deliberate indifference standard to the Initial Officers.

Nor can the facts of this case support application of anything other than the intent-to-harm standard for the Downtown Officers. While Plaintiffs argue that the Downtown Officers had time to deliberate during the forty-five seconds sitting at the red light behind Johnson's vehicle, the complaint makes clear that Jackson was going to attempt to make a traffic stop, not necessarily commit to a pursuit of Johnson. Even assuming that forty-five seconds affords sufficient time to make an "unhurried judgment" or "the chance for repeated reflection, largely uncomplicated by the pulls of competing obligations," *Lewis*, 523 U.S. at 853, at this point in time, the allegations in the complaint make clear that Johnson had not yet fled from the Downtown Officers. Once he did so, the calculus changed, and the Downtown Officers had to decide whether to engage in a pursuit in response to Johnson's failure to submit to the traffic stop.

These facts more closely analogous to those in *Lewis* than those in *Dean*. Recall that in *Lewis*, the pursuing officers had not observed any unlawful behavior beyond the initial traffic

---

[6] To be clear, the complaint does not appear to allege that this statement was the wrongful act that violated Plaintiffs' substantive due process rights. *See* ECF 1, at 23 ¶ 116 ("Each of the Officer Defendants caused Defendant Johnson's vehicle to strike the Plaintiffs' vehicle by: (1) initiating and re-initiating a pursuit; (2) failing to utilize emergency sirens; and (3) failing to intervene.").

violation (speeding) and the subsequent evasion after the officers attempted to stop the motorcycle. *See* 523 U.S. at 836–37. Here, just as in *Lewis*, the complaint alleges that the Initial Officers witnessed Johnson reverse the wrong way down a one-way street and—after the Initial Officers activated their emergency lights to attempt to make a stop—flee, resulting in the Initial Officers giving chase. ECF 1, at 15 ¶¶ 67–70. Except unlike in *Lewis*, the Initial Officers "backed off" and called in aerial assistance. *Id.* ¶ 71. Following directions and on limited (albeit allegedly erroneous) information, the Downtown Officers attempted to make a traffic stop. *See id.* at 16 ¶ 76, at 17 ¶¶ 79–80. Only once Johnson failed to stop after the "yelp" and emergency lights (but no full siren) were activated did a 0.3-mile-long chase ensue, which ended when Johnson's fleeing car collided with Plaintiffs' and others' vehicles at the intersection of North Gay and Orleans. *Id.* at 18–19 ¶¶ 85–89.

Bound by *Lewis*, the Court therefore finds that the intent-to-harm standard applies here.

     *ii.*  *Plaintiffs' Allegations Do Not Meet* Lewis*'s Intent-to-Harm Standard.*

Plaintiffs argue that the Initial Officers acted with an intent to harm Johnson,[7] which can be inferred from the officers' lack of sufficient justification to stop Johnson in the first place, ECF 24-1, at 8–10, 18–20, and their "lies and omissions," *id.* at 17. Plaintiffs rely on *Johnson v. Baltimore Police Department*, 452 F. Supp. 3d 283 (D. Md. 2020), in arguing that the Officer Defendants' conduct shocks the conscience under the intent-to-harm standard. *See* ECF 24-1, at 20–23. But *Johnson* is easily distinguishable from the facts here. In *Johnson*, Judge Gallagher

---

[7] No one disputes that the intent-to-harm inquiry is focused on Johnson, rather than Plaintiffs, who were innocent bystanders. "Though the Fourth Circuit has not directly addressed this precise issue, the weight of authority post-*Lewis* holds that the 'intent to harm' standard applies to substantive due process claims arising out of police chases, whether the claim is brought by the target of the chase, or an innocent bystander." *Johnson v. Balt. Police Dep't*, 452 F. Supp. 3d 283, 302 (D. Md. 2020).

found that the plaintiffs, the estates of innocent bystanders struck by a pursued vehicle, had

sufficiently pled a substantive due process claim. 452 F. Supp. 3d at 301–02; *id.* at 301 ("If there

were ever a case whose facts almost precisely fit the contours of the *Lewis* Court's narrow

definition of a police chase that might shock the conscience, Plaintiffs have alleged it."). That case

involved a police pursuit initiated by members of the BPD's infamous Gun Trace Task Force:

> Plaintiffs have alleged that [Officers] Jenkins and Guinn, dressed in plainclothes
> and without observing any suspicious or ongoing criminal conduct, attempted to
> maneuver their BPD-issued, unmarked police vehicle to "box in" the car Burley
> and Matthews occupied. Burley, fearing for his and Matthews's lives, was able to
> escape the "box in," and speed down Parkview Avenue. Instead of ending the failed
> effort to illegally seize Burley and Matthews, Plaintiffs allege that Jenkins and
> Guinn sped after them down residential streets, running stop signs in five different
> intersections, without ever activating their vehicles' emergency equipment. This
> chase only ended once Burley struck Decedent's car at Gwynn Oak Avenue and
> Belle Avenue.

*Id.* at 301–02 (citations to *Johnson* complaint omitted). Here, the Initial Officers, while in an

unmarked car, attempted to conduct a traffic stop based on observed suspicious conduct and by

activating emergency equipment. ECF 1, at 15 ¶¶ 67–70. Johnson then fled. *Id.* ¶ 70. The Initial

Officers backed off the chase. *Id.* ¶ 71. Other officers then attempted to conduct another traffic

stop downtown with activated lights and a "yelp" (albeit no full siren). *Id.* at 17 ¶ 80. Johnson

fled again. *Id.* ¶ 81.

These facts do not support an inference that the Officer Defendants intended to harm

Johnson. First, even if, as Plaintiffs contend, that "it is arguable as to whether [reversing the wrong

way down a one-way street] even constitutes a traffic violation," *id.* at 23 ¶ 118, Supreme Court

precedent in the Fourth Amendment context supports the notion that police officers have a

justifiable interest in apprehending a fleeing vehicle after it fails to submit to an officer's attempted

stop. *See Scott v. Harris*, 550 U.S. 372, 385 (2007) ("But wait, says respondent: Couldn't the

innocent public equally have been protected, and the tragic accident entirely avoided, if the police

20

had simply ceased their pursuit? We think the police need not have taken that chance and hoped for the best. . . . First of all, there would have been no way to convey convincingly to respondent that the chase was off, and that he was free to go. . . . Second, we are loath to lay down a rule requiring the police to allow fleeing suspects to get away whenever they drive *so recklessly* that they put other people's lives in danger."(emphasis in original)); *California v. Hodari D.*, 499 U.S. 621, 627 (1991) ("Street pursuits always place the public at some risk, and compliance with police orders to stop should therefore be encouraged. Only a few of those orders, we must presume, will be without adequate basis, and since the addressee has no ready means of identifying the deficient ones it almost invariably is the responsible course to comply.").

While the Court is mindful not to overread this jurisprudence, *see Lange v. California*, 594 U.S. 295, 307 (2021) ("We have no doubt that in a great many cases flight creates a need for police to act swiftly. . . . But no evidence suggests that every case of misdemeanor flight poses such dangers."), courts have rejected arguments that the police lacked a justifiable basis for pursuit when a pursuit begins after flight from a traffic stop. *See Temkin*, 945 F.2d at 723 (finding no substantive due process violation at summary judgment stage where innocent bystander plaintiff was injured when pursued vehicle struck plaintiff's and where the chase had been initiated because of a minor violation and it failed to comply with governing police pursuit policy); *Graves v. Thomas*, 450 F.3d 1215, 1223 (10th Cir. 2006) (finding that "unexplained flight from an attempted traffic stop" was justification enough for pursuit); *Slusarchuk v. Hoff*, 346 F.3d 1178, 1183 (8th Cir. 2003) ("Appellees argue that officers [] evidenced the requisite intent to harm in pursuing [the suspect] because they did not have probable cause to stop him and therefore the pursuit was unrelated to a legitimate object of arrest. This contention is without merit. When [the suspect] refused to stop after the officers activated their emergency lights, they had probable cause to arrest

him for committing a felony in their presence, regardless of their initial reasons for the attempted stop. Thus, the pursuit was 'aimed at apprehending a suspected offender' and did not objectively evidence 'a purpose to cause harm unrelated to the legitimate object of arrest.'" (quoting *Lewis,* 523 U.S. at 836)). The Officer Defendants' alleged violation of the BPD vehicle pursuit does not change the Court's analysis. *See Temkin,* 945 F.2d 716, 723 (rejecting substantive due process challenge where plaintiffs had asserted that the chase failed to comply with governing police pursuit policy).

While Plaintiffs argue that the Initial Officers intentionally misused their vehicle by "follow[ing] Defendant Johnson for nearly a mile before revealing their identity as police officers by initiating their emergency lights and sirens," ECF 24-1, at 22 (citing Dispatch Audio 00:04– 01:16), the complaint alleges otherwise, *see* ECF 1, at 15 ¶ 70 (noting that "Defendant Leak activated emergency equipment to conduct a traffic stop of the Odyssey" *then* "[t]he Odyssey failed to stop and began to accelerate 'in a clear attempt to elude officers'"). To the extent the Court can consider the Dispatch Audio, it is not entirely clear from the Court's listening whether the Dispatch Audio supports or contradicts the allegations in Plaintiffs' complaint. The Court is therefore left, at this stage, to rely on the allegations in the complaint. Those allegations cannot be read to infer the requisite "improper or malicious motive" and intent to harm. *See Lewis,* 523 at 855. And again, as explained above, the Initial Officers backed off their chase and did not participate in the pursuit resulting from Johnson failure to submit to the second attempted traffic stop. Plaintiffs have not alleged conscience-shocking conduct by the Initial Officers that resulted in Plaintiffs' injuries. Plaintiffs have therefore not stated a substantive due process claim against the Initial Officers.

Nor does the complaint support an inference that the Downtown Officers acted with an intent to harm Johnson unrelated to any legitimate law enforcement interest. To repeat, Defendants Jackson and Dollard proceeded with attempting to effectuate a traffic stop, which was, at least in part directed by an individual who Plaintiffs assert was a BPD captain. ECF 1, at 17 ¶ 79(b). Even if the statement that the vehicle was coming from the area of a shooting was false (and intentionally so), there are no allegations in the complaint that come close to suggesting the Downtown Officers knew of its falsity, and it was, at minimum, true that the vehicle had eluded a prior traffic stop by the Initial Officers. Defendant Jackson, with Dollard as backup, attempted to make a safe stop by activating their lights and the "yelp" siren. Johnson fled. Jackson and Dollard responded to that flight by beginning a pursuit that spanned only 0.3 miles. Regardless of whether the Initial Officers had a justifiable basis for stopping Johnson, even drawing all reasonable inferences in Plaintiffs' favor, the Downtown Officers did. "[O]ne way of improperly using hindsight is to reason backwards from an accident to the decisions that set it into motion." *Waybright v. Frederick Cnty.*, 528 F.3d 199, 209 (4th Cir. 2008). "One must instead take the situation *ex ante*, from the perspective of the state official, and ask whether his or her decisions when he or she made them were of a magnitude to shock the conscience." *Id.* The Downtown Officers therefore had a justifiable basis for pursuing Johnson after he fled from their attempted traffic stop. The misconduct alleged here is much less egregious than that at play in *Lewis* or *Temkin*, where the Supreme Court and Fourth Circuit rejected similar substantive due process claims. For these reasons, the Court finds that Plaintiffs have not stated a substantive due process claim against any of the Officer Defendants.

2.    Fourteenth Amendment Failure to Intervene

A failure-to-intervene claim is "'premised on a law officer's duty to uphold the law and

protect the public from illegal acts, regardless of who commits them.'" *See Stevenson v. City of*

*Seat Pleasant*, 743 F.3d 411, 416–17 (4th Cir. 2014) (quoting *Randall v. Prince George's Cnty.*,

302 F.3d 188, 203 (4th Cir. 2002)). "[S]uch a duty attaches when an officer observes or has reason

to know that 'a constitutional violation [is being] committed' by other officers and possesses 'a

realistic opportunity to intervene to prevent the harm from occurring.'" *Randall*, 302 F.3d at 203–

04 (quoting *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994)). Failure-to-intervene claims

are "by nature, concomitant with a plaintiff's other [Section] 1983 claims." *Johnson v. Balt. Police*

*Dep't*, Civ. No. ELH-19-00698, 2020 WL 1169739, at *15 (D. Md. Mar. 10, 2020) (citing *Hinkle*

*v. City of Clarksburg*, 81 F.3d 416, 420 (4th Cir. 1996)). To state a claim for failure to intervene,

a plaintiff must assert that an officer was (1) "confronted with a fellow officer's illegal act," (2)

"possesse[d] the power to prevent it," and (3) "cho[se] not to act." *Burley v. Balt. Police Dep't*,

422 F. Supp. 3d 986, 1030 (D. Md. 2019) (quoting *Brooks v. Johnson*, 924 F.3d 104, 110 (4th Cir.

2019) (internal citation omitted)).

Because the Court finds that Plaintiffs have not alleged an underlying constitutional

violation, it must also dismiss Plaintiffs' failure-to-intervene claim against the Officer Defendants.

3.    Qualified Immunity

Because the Court finds that Plaintiffs have not raised a substantive due process claim, the

Court need not address the argument that the Officer Defendants are entitled to qualified immunity.

### B.    BPD and Harrison

Plaintiffs also bring three *Monell* claims against the BPD (condonation, failure to train, and failure to supervise) and a supervisory liability claim against Harrison, all of which the BPD and Harrison move to dismiss. *See generally* ECF 17.

Without an underlying constitutional violation, none of these claims can survive. "The law is quite clear in this circuit that a section 1983 [*Monell*] claim cannot be maintained against a governmental employer in a case where there is no underlying constitutional violation by the employee." *Young v. City of Mount Ranier*, 238 F.3d 567, 579 (4th Cir. 2001) (citing *Grayson v. Peed*, 195 F.3d 692, 697 (4th Cir. 1999); *Temkin*, 945 F.2d at 724), *abrogated on other grounds by Short v. Hartman*, 84 F.4th 593 (4th Cir. 2023); *see also City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1996) (per curiam) ("[N]either *Monell* . . . nor any other of our cases authorizes the award of damages against a municipal corporation based on the actions of one of its officers when the jury has concluded that the officer inflicted no constitutional harm."); *Anderson v. Caldwell Cty. Sheriff's Off.*, 524 F. App'x 854, 862 (4th Cir. 2013) ("No actionable claim against supervisors or local governments can exist without a constitutional violation committed by an employee."); *see also Grim v. Balt. Police Dep't*, Civ. No. ELH-18-3864, 2020 WL 1063091, at *4 (D. Md. Mar. 5, 2020) ("It is axiomatic that a *Monell* claim cannot lie 'where there is no underlying constitutional violation by the employee.'" (quoting *Young*, 238 F.3d at 579)).

As such, all of Plaintiff's *Monell* claims against the BPD and the supervisory liability claim against Harrison must be dismissed.

### C.    Remaining State Law Claims

All that remains are the gross negligence claim against Officer Defendants, which Officer Defendants move to dismiss, *see* ECF 16-1, at 16–18, and the negligence claim against Johnson,

which is not the subject of either motion to dismiss. Both claims arise under Maryland state law, and there is no independent basis for federal jurisdiction as there is not complete diversity between the parties.[8] District courts "may decline to exercise supplemental jurisdiction" under certain circumstances, including when "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). "[A] district court has inherent power to dismiss the case or, in cases removed from State court, to remand, provided the conditions set forth in § 1367(c) for declining to exercise supplemental jurisdiction have been met." *Hinson v. Norwest Fin. S.C., Inc.*, 239 F.3d 611, 617 (4th Cir. 2001). "Among the factors that inform this discretionary determination are convenience and fairness to the parties, the existence of any underlying issues of federal policy, comity, and considerations of judicial economy." *Shanaghan v. Cahill*, 58 F.3d 106, 110 (4th Cir. 1995) (citations omitted).

As Judge Chasanow recently found in a similar case, "[t]his case is still in its early stages and the remaining claims present potentially complicated questions of state law" and the state court "is better suited to adjudicate [state law] claims." *Marshall v. Town of Bladensburg*, Civ. No. DKC 24-1549, 2025 WL 822936, at *7–8 (D. Md. Mar. 14, 2025) (declining to exercise supplemental jurisdiction over pendant negligence, gross negligence, and Maryland Declaration of Rights claims after the Court dismissed the Fourth and Fourteenth Amendment and *Monell* claims brought under § 1983 and remanding the case to state court). The negligence and gross negligence claims will therefore be dismissed without prejudice so that Plaintiffs may raise them in state court.

---

[8] One plaintiff is a citizen of Maryland and two are citizens of Virginia. *See* ECF 1, at 5 ¶¶ 18–20. Plaintiffs allege that all the Officer Defendants and Defendant Johnson are citizen of Maryland. *See id.* at 6–7 ¶¶ 23–28, 32.

## IV.    **CONCLUSION**

For the foregoing reasons, the Officer Defendants' and the BPD's motions to dismiss, or, in the alternative, for summary judgment, ECFs 16 and 17, both treated as motions to dismiss, are granted.   Counts I and II against the Officer Defendants, counts III, IV, and V against the BPD, and count VI against Harrison are dismissed.   Counts VII (against the Officer Defendants) and VIII (against Johnson) are dismissed without prejudice because the Court declines to exercise supplemental jurisdiction over them.

A separate implementing Order will issue.

Dated: <u>March 24, 2025</u>                                         <u>          /s/          </u>
                                                                   Brendan A. Hurson
                                                                   United States District Judge

27